E.I. DuPONT de NEMOURS & CO., INC., ICI Americas, Inc., Hoechst Celanese Corporation, Plaintiffs,

v.

UNITED STATES, Defendant,

Cheil Synthetics, Inc., SKC Limited, SKC America, Inc., Defendant–Intervenors.

Court No. 91–07–00487.
Slip Op. 93–229.

United States Court of
International Trade.

Dec. 6, 1993.

Wilmer, Cutler & Pickering, John D. Greenwald, Stravros J. Lambrinidis, Howrey & Simon, Michael A. Hertzberg, Matthew J. Clark, Paul M. Orbach, for plaintiffs E.I. DuPont de Nemours & Co., Inc., ICI Americas Inc., and Hoechst Celanese Corp.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Michael Kane, Vanessa P. Sciarra, Stephen J. Claeys, of counsel, for Import Admin., defendant.

Akin, Gump, Hauer & Feld, Edith E. Scott, Warren E. Connelly, for defendant-intervenor Cheil Synthetics, Inc.

Donovan Leisure Newton & Irvine, Michael P. House, R. Will Planert, Raymond Paretzky, for defendant-intervenor SKC Ltd. and SKC America, Inc.

## OPINION

MUSGRAVE, Judge.

Confidential material appears in the confidential version of this opinion in brackets and

is deleted from the public version of the opinion.

In this action, plaintiffs E.I. DuPont de Nemours & Co., Inc., ICI Americas Inc., and Hoechst Celanese Corporation challenge the final results of the administrative review of antidumping findings announced in two determinations by the International Trade Administration, U.S. Department of Commerce (the "ITA" or the "Department" or "Commerce"): *Final Determination of Sales at Less than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea*, 56 Fed.Reg. 16,305–16,-317 (April 22, 1991); and *Amended Final Determination of Sales at Less than Fair Value: Polyethylene Terephthalate Film, Sheet, and Strip From the Republic of Korea*, 56 Fed.Reg. 25,669–25,670 (June 5, 1991).

Plaintiffs have jointly filed briefs on their behalf. Defendant-intervenors SKC Limited, SKC America, Inc., and Cheil Synthetics, Inc. have each filed briefs on their own behalf in opposition to plaintiffs' motions.

## BACKGROUND [1]

On April 27, 1990, an antidumping petition was filed by E.I. DuPont de Nemours & Company, Inc. concerning imports of polyethylene terephthalate film, sheet, and strip. Polyethelyene Terephthalate film, also known as PET film, is a clear flexible transparent material which is used for, among other things, magnetic recording media, laminations, transparencies, cable sheathing and food packaging. The manufacture of PET film for these purposes also results in the production of an inferior or "off-grade" that is used for other purposes including "shingle-release," an interleaved separator for roofing shingles.

The petition alleged, *inter alia*, that Korean manufacturers of PET film were selling PET film in the United States at less than fair value and were also selling PET film in their home market at below the cost of production. P.R. Document 1 at 29. On May 24, 1990, Commerce published a notice of its decision to initiate a less-than-fair value investigation of the subject PET film. *See* 55 Fed.Reg. 21,417. On November 30, 1990, Commerce preliminarily determined that sales of PET film from Korea were being made at less-than-fair value. P.R. Document 229; 55 Fed.Reg. 49,668. On April 22, 1991, the Department published its final determination of sales at less-than-fair value. P.R. Document 308; 56 Fed.Reg. 16,305. An amended final determination in the subject investigation was published on June 5, 1991. 56 Fed.Reg. 25,669. On June 5, 1991, the International Trade Commission ("ITC") reported that imports of PET film were causing material injury to the domestic industry. 56 Fed.Reg. 25,695. On June 5, 1991, Commerce issued an antidumping duty order covering imports of PET film from Korea. 56 Fed.Reg. 25,669. Plaintiffs now allege that the ITA erred in calculating the United States Price ("USP") and Foreign Market Value ("FMV") of PET film imported by defendant-intervenors SKC Limited, SKC America (collectively "SKC"), and Cheil Synthetics, Inc. ("Cheil"). As a result, plaintiffs argue, the final determinations understate the dumping margins for defendant-intervenors.

## STANDARD OF REVIEW

In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoting Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from

---

1. The Court quotes without attribution the uncontroverted facts in the record. Citations to documents contained in the public record of this administration review are designated "P.R." Citations to documents contained in the confidential record of this administrative review are designated "C.R."

the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *See also, Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir. 1984). The Court may not substitute its judgment for that of the agency when the choice is between two fairly conflicting views, even though the Court would justifiably have made a different choice had the matter been before it *de novo. See American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (*citing Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464), *aff'd sub nom., Armco, Inc. v. United States,* 760 F.2d 249 (Fed.Cir.1985).

■ Moreover, substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Universal Camera Corp.,* 340 U.S. at 478, 488, 71 S.Ct. at 459, 464.

■ The precise way in which courts review agency findings cannot be imprisoned within any form of words; new formulas attempting to rephrase the old are not likely to be more helpful than the old. There are no talismanic words that can avoid the process of judgment. *Universal Camera Corp.,* 340 U.S. at 489, 71 S.Ct. at 465.

### DISCUSSION

1. *SKC's And Cheil's Duty Drawback Adjustment Claims*

■ The Court first addresses plaintiffs' argument that the ITA improperly adjusted the USP for Korean drawback allowances for imported raw materials that were exported in finished film. Plaintiffs argue that the

allocation of drawback allowances for raw materials was inconsistent with the allocation of costs for raw materials for the same products, and the drawback adjustment frequently exceeded the duties paid.

In response, the ITA points out that during verification, it was able to establish that both SKC and Cheil provided adequate evidence to satisfy the criteria enumerated under 19 U.S.C. § 1677a(d)(1)(B). Therefore, ITA argues that its determination to allow the duty drawback adjustments is supported by substantial evidence and is in accordance with law. Pursuant to 19 U.S.C. § 1677a(d)(1)(B):

(d) **Adjustments to purchase price and exporter's sales price.**—

The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States;

Accordingly, Commerce must increase USP by the amount of duties that Korea refunded to Cheil and SKC as a result of exportation of merchandise to the United States.

The drawback claim was based on average per pound amounts that apply to all types of film even though materials costs varied among film types. *Letter dated October 15, 1990 from Dow, Lohnes & Albertson,* C.R. Document 59, Reel 4, at Frame 104; *Letter dated October 19, 1990 from Akin, Gump, Strauss, Hauer & Feld,* C.R. Document 60, Reel 4, at Frames 142–49. Plaintiffs point out that the claimed duty drawback adjustments for SKC varied by. [ ] *Marsh SKC COP/CV Memorandum,* C.R. Document 103, Reel 4, at Frames 1510–11, 1517–18; *See Computer Printout of SKC's U.S. Sales,* Reel 5 of 6. However, [ ] and the applicable Korean duty rate dropped from 15.5% *ad valorem* to 13.5% *ad valorem* on January 1, 1990. C.R. Document 59, Reel 4, at Frame 104; C.R. Document 60, Reel 4, at Frames 142–49. As a result, plaintiffs maintain, the

duty drawback adjustment frequently [ ]

Plaintiffs provide an example of the alleged inconsistency in regard to Cheil with an example. [ ] Dividing the drawback amount by the duty rate gives the raw material amount upon which the duty was based. [ ]. Plaintiffs refer to these raw materials costs as "the substantial equivalent of the total cost of manufacturing," an "obvious problem." *Plaintiffs' Brief In Support For Judgment Upon The Agency Record,* at 21–22. Plaintiffs do not, however, indicate what proportion of total cost would typically be raw material cost.

In addition, plaintiffs point out that an ITA accountant who calculated raw material costs "as a check," came up with a figure for the XA–30–C film of [ ] *See Cheil COP/CV Memorandum, supra* note 8, Frame 1468. The [ ] Similarly, for the XV–30–C film, the ITA accountant calculated a cost of [ ] which would imply a duty drawback adjustment of [ ] *Id.* The ITA allowed a duty drawback adjustment for the XV–30–C film of [ ]

In the final determination, the ITA rejected plaintiffs arguments on this issue.

> Respondents were able to document claimed duty drawback amounts, as reported in the sales listing. We verified that respondents receive duty drawback for ingredients that are imported and then exported as PET film to the United States. We examined import and export permits, government allowable duty drawback rates, certificate lists of materials used, material usage rates, and duty drawback refund applications. Respondents tied duty drawback to specific U.S. sales using import permits, export permits, duty drawback applications, and duty drawback refund certificates.

*Final Determination: Polyethylene Terephthalate film;* 56 Fed Reg. at 16,308–16,309.

An adjustment is appropriate so long as Commerce determines that import duties are actually paid and rebated, and there is a sufficient link between the cost to the manufacturer (*i.e.* import duties paid) and the claimed adjustment (rebate granted). *See* *Huffy Corp. v. United States,* 10 CIT 214, 216, 632 F.Supp. 50, 53 (1986). The ITA concluded at verification that this test had been satisfied.

The ITA also disagreed with plaintiffs' contention that the cost of materials used in assessing the cost of manufacturing PET film should correlate with the cost of materials claimed for duty drawback.

> For a variety of reasons, raw materials costs may not precisely correlate to drawback amounts. For example, changes in duty rates and product mix over time, sourcing of raw material inputs (domestic or imported), time lags between import of raw materials and export of finished merchandise, and fluctuating raw materials costs may all affect the calculation of costs and drawback amounts.

*Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,309. Thus, similarly to its position on duty rebates, the ITA contends that merely a sufficient rather than a perfect link is required.

Plaintiffs further argue that Cheil's drawback claim is overstated because a certain amount of material is used from domestic sources. The ITA determined that

> Petitioners have incorrectly concluded that the percentage of particular material inputs sourced domestically reflects the total percentage of materials sourced domestically. At verification, we examined the amount of input material sourced domestically and requested that respondent calculate the actual impact on Cheil's duty drawback claim. Based on this analysis, we concluded that the actual impact of the domestically sourced input on duty drawback is negligible.

*Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,314. At verification, the ITA found that Cheil purchases [ ] *Cheil Verification Report,* C.R. Document 83, Reel 4, at Frame 901. The record shows that the ITA reduced Cheil's drawback adjustment to account for the raw material purchased from domestic sources. Exhibit 5–11, at 619.

Plaintiffs argue that the ITA's conclusion that the impact of domestic material was

negligible is erroneous [ ] the period of investigation of November 1989 to April 1990 from which the cost of production data was derived.

Plaintiffs make the same argument with respect to SKC. SKC stated in a letter that [ ] *Letter dated September 27, 1990 from Dow, Lohnes & Albertson,* C.R. Document 51, Reel 3, at Frame 2426. Plaintiffs argue that this is inconsistent with the fact that the ITA accepted drawback claims [ ] *See Computer Printout of SKC's U.S. Sales,* Reel 6 of 6, at 156–78.

The ITA responds that the agency investigated SKC's and Cheil's duty drawback claims by reviewing documents, provided by the companies, which traced the payment of import duties to the receipt of duty drawback payments.

In *Carlisle Tire & Rubber Co. v. United States,* 11 CIT 168, 657 F.Supp. 1287 (1987), the Court held that the language of 19 U.S.C. § 1677a(d)(1)(B) requires that

In determining whether such an adjustment should be made, Commerce considers (1) whether the import duty and rebate are directly linked to, and dependent upon, one another; and (2) whether the company claiming the adjustment can show that there were sufficient imports of the imported raw materials to account for the drawback received on the exported product.

657 F.Supp. at 1289.

The ITA traced SKC's and Cheil's drawback claims by reviewing documents provided by both parties, and found a sufficient link between duties paid and drawback conferred. C.R. Document 83, at 25–27; C.R. Document 87, at 33–34. There was no indication that drawback payments ever exceeded the amount of duties initially paid. *Defendant's Memorandum In Opposition To Plaintiffs' Motion For Judgment Upon The Administrative Record,* at 23–24.

As for the fact that the respondents' rates of use and cost of imported raw materials changed during the period of investigation, the ITA points out that a substantial number of the duty drawback payments were for importations that occurred before the period

of investigation and naturally would not reflect subsequent changes. *Defendant's Memorandum In Opposition,* at 25–26. Drawback substitution requires only that respondents imported sufficient raw materials to produce the amount of PET film they exported. The ITA verified that SKC and Cheil imported and paid duties on a kilogram of raw materials for every kilogram which they exported and upon which they received drawback. C.R. Document 83 at 25–27; C.R. Document 87 at 33–34.

The ITA admits that there are discrepancies between the cost of raw materials that were the bases of respondents' drawback claims and the cost of materials used in its cost of production analysis. However, the ITA argues that the discrepancies arise due to two reasons. First, the raw materials upon which duty drawbacks were granted were purchased earlier than the raw materials examined by it for the cost of production analysis. *Defendant's Memorandum In Opposition,* at 27. The duty drawbacks granted during the period of investigation were often for importations [ ]. *SKC Verification Exhibit 51, Cheil Verification Exhibit 5–12.* Further, the ITA argues that this time lag between the purchases examined by it in conducting the cost of production analysis and the purchases corresponding to the duty drawback payments caused the prices of these two sets of raw materials to diverge because changes in duty rates, product mixes, raw material sources, and prices may have taken place. *Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,309.

The ITA's second reason for the differences in raw materials costs is that Korea imposed import duties and, subsequently, granted duty drawbacks based upon a valuation method that is different from the valuation method which Commerce must use for analyzing cost of production. *Defendant's Memorandum In Opposition,* at 28. Korea's import duties upon PET film raw materials were based upon the import prices of the raw materials, plus a few minor adjustments. P.R. Document 120, Appendix C–10 (Korean Customs Act, Article 9); P.R. Document 173 at Appendix C–3. While Korean import

duties are based on import prices of the materials, the ITA argues that under *Ipsco, Inc. v. United States,* 13 CIT 402, 714 F.Supp. 1211 (1989), it was required to use a different valuation for cost of production. However, as noted below, *Ipsco* was reversed after briefs in this case were filed, and the government now concedes that remand is appropriate in light of the reversal.

The evidence in the administrative record supports ITA's conclusion that both Cheil and SKC qualified for the adjustments under 19 U.S.C. § 1677a(d)(1)(B). The ITA was able to demonstrate that the duty drawback claimed was calculated on the basis of the dutiable value of imported material incorporated in the production of PET film which was exported to the United States. This determination is supported by documentation showing actual payments by both Cheil and SKC of import duties and amount of raw materials actually imported. Both Korean producers provided Commerce with evidence showing the quantity of raw materials actually incorporated into the exported PET film. Furthermore, the ITA tied duty drawback to specific U.S. sales based on a review and verification of import permits, export permits, duty drawback applications, and drawback refund certificates. In this case, the ITA determined that both Cheil and SKC were entitled to receive certain adjustments for drawback under the criteria set forth in 19 U.S.C. § 1677a(d)(1)(B). Essentially, the ITA examined the entire document trail to link the receipt of a duty drawback to the importation of the raw materials and the payment of import duties. Since there is sufficient evidence from which the ITA could reasonably draw the conclusion that both companies qualified for the adjustments under 19 U.S.C. § 1677a(d)(1)(B), that determination is supported by substantial evidence and in accordance with law.

2. *Value Added Tax Adjustment to United States Price*

 ██ Plaintiffs next argue that the ITA improperly adjusted the USP for value-added taxes ("VAT") imposed on products sold in Korea but not on exports to the United States. Section 772(d)(1)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677a(d)(1)(C) (1988), directs that the USP be increased by the amount of taxes imposed in the country of exportation that have been rebated by reason of export, "but only to the extent that such taxes are added to or included in the price of such or similar merchandise. when sold in the country of exportation...." To determine the amount of the VAT adjustment, the ITA applied the Korean VAT rate to the gross sales prices to the first unrelated U.S. customer. *Final Determination: Polyethylene Terephthalate;* 56 Fed. Reg. at 16,309. The plaintiffs claim that the price to the first unrelated U.S. customer is the incorrect tax base for calculating the tax adjustment. *Plaintiffs' Brief,* at 30. Plaintiffs argue that this includes such items as U.S. selling expenses, duty, freight and insurance, which represent value added outside of Korea. Since those costs are not added to or included in the price of products sold in Korea, their inclusion violates the plain meaning of § 1677a(d)(1)(C). *Id.* at 30–31.

Plaintiffs assert that the VAT methodology adopted by the ITA not only increased USP beyond the level permitted by the statute, but also created an irreconcilable conflict between Commerce's VAT rebate adjustment and the statutory provisions that require the deduction from the USP of "the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States," as well as, "the amount, if any of ... expenses generally incurred by or for the account of the exporter in the United States in selling ... [the] merchandise." *See* 19 U.S.C. §§ 1677a(d)(2)(A) and 1677a(e)(2). They argue that if the USP is increased by a VAT rebate adjustment on these items, then the full VAT-inflated amounts must be deducted from the USP under the latter sections. *Plaintiffs' Brief,* at 31.

In addition, plaintiffs argue that Korea's VAT applies a zero rate to export sales, services furnished outside of Korea and international transport services. Aside from the fact that home market sales would not

include expenses for ocean freight, marine insurance, U.S. duty and U.S. selling expenses, these items would be subject to a zero rate even if the goods themselves were taxable. Thus, if these items were taxable, rational businessmen would always buy f.o.b. port of export. *Id.* at 34. Moreover, the ITA itself has calculated the VAT adjustment based on a USP net of all charges that would not have been incurred had the product been sold in the home market. *Id.* at 36, citing *Industrial Nitrocellulose from the Federal Republic of Germany,* 55 Fed.Reg. 21,058 (Final) (May 22, 1990).

The ITA responds that it seeks to use a tax base most similar to that used in Korea for the calculation of VAT. Since the domestic tax base is the gross delivered price to the first unrelated Korean customer, the ITA argues that the gross delivered price to the first unrelated U.S. customer is the proper tax base for the VAT adjustment. *Defendant's Memorandum In Opposition,* at 32.

The method the ITA used, the government continues, is consistent with the adjustments for shipping to the United States required by 19 U.S.C. § 1677a. Using a tax base to calculate the USP tax adjustment that is the most similar to the exporting country's tax base is also required by the general principle underlying the antidumping law; the ITA asserts that it is well-established that a primary goal of the antidumping statute is for Commerce to make comparisons on a fair or "apples to apples" basis. *Id.* at 31. The ITA states that if plaintiffs' argument is accepted, both the USP tax adjustment and the amount of VAT included in FMV would have to be recalculated using the ex-factory price as a tax base. By way of circular reasoning, the ITA concludes that this is not consistent with using the same tax base as Korea, the price to the first unrelated party. Thus, the ITA is faced with the dilemma of violating one of the country's statutes by choosing either of the above discussed methodological alternatives.

In addition, the ITA argues, no language in the relevant statutes requires what plaintiffs seeks. *Id.* at 33–34. Plaintiffs' citations of administrative reviews from other countries are not relevant, because the proper method of tax adjustment varies with the tax laws of the country. *Id.* at 34–35. For example, plaintiffs rely upon Commerce's tax adjustment method in *Industrial Nitrocellulose from the Federal Republic of Germany, supra,* to support its claim. The ITA argues that this reliance is misplaced because in that case Commerce was required to follow the Federal Republic of Germany's tax laws and, possibly its terms of domestic sales. The ITA further argues that if a VAT is applied, the exporting country's terms of domestic sales may also affect Commerce's calculation of the USP tax adjustment. The proper method for calculating the USP tax adjustment, therefore, may differ from country to country and even between different types of taxes within a country. *Id.* at 34.

One of the goals of the antidumping statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—the so-called apples to apples comparison. *Smith–Corona Group v. United States,* 713 F.2d 1568, 1578 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S,Ct. 1274, 79 L.Ed.2d 679 (1984). In *Zenith Electronics Corp. v. United States,* 988 F.2d 1573, 1580 (Fed.Cir.1993), *reh'g en banc, denied, Zenith Electronics Corp. v. United States,* the court stated that "[t]itle 19 explicitly requires Commerce to increase USP by the amount of tax that the exporting country *would have assessed on the merchandise if it had been sold in the home market.*" (emphasis added). It is clear from this statement, as well as the explicit language of the statute itself, that the sales price to which the VAT rate is to be applied is the USP calculated at the same point in the chain of commerce as where the Korean tax authorities apply the Korean VAT to home market sales. For example, if when taxing home market sales, the Korean tax authorities apply the Korean VAT rate to gross sales price to calculate the amount of tax due, the ITA is required to apply the Korean VAT rate to U.S. gross sales price and add the resulting amount to USP. *See* 19 U.S.C. § 1677a(d)(1)(C).

Support for this position is provided by the Court of Appeals for the Federal Circuit's recent decision on the tax base issue in *Daewoo Electronics. Co. v. United States,* 6 F.3d

1511 (Fed.Cir.1993). The court in *Daewoo* interpreted section 1677a(d)(1)(C) as follows:

> mandates a calculation of imputed tax amounts to be added to the USP, but does not specify to which USP the Korean taxes are to be applied as the product moves to the consumer. This determination is important because the Korean taxes are not a specific amount, but instead *ad valorem* in nature; and it is difficult because the question is a hypothetical. *The Korean taxes must be applied to sales of goods at some discrete moment in the stream of commerce with or in the United States, a different market from that in which the taxes should be levied, but are not, because of exportation.*

*Daewoo*, 6 F.3d at 1519 (emphasis added).

In *Daewoo*, the ITA determined that evidence on the administrative record showed that the Korean tax authorities applied their *ad valorem* taxes to "the net price of the delivered televisions receivers to unrelated dealers." Therefore, the ITA applied the Korean tax rate to the comparable USP, *i.e.* the price to the first unrelated purchaser. The court affirmed the ITA's methodology determining: 1) where in the stream of commerce the Korean authorities applied the *ad valorem* tax rate in the home market; 2) applying the same tax rate to USP calculated at the same point in the chain of commerce; and 3) adding this amount to USP. *Daewoo*, at 1519. *See also, Federal–Mogul Corporation v. United States*, —— CIT ——, 834 F.Supp. 1391, 1397 (1993).

Given the evidence, and the recent decision issued by the Federal Circuit, this Court cannot agree with plaintiffs that the ITA erred in selecting the analogous point for the tax base in the United States. Substantial evidence supports the ITA's choice, and that is all the statute requires. ITA's determination of the price to the first unrelated U.S. customer as the appropriate tax base is reasonable and is in accordance with law.

 The ITA also argues that even if it incorrectly selected a tax base for the USP tax adjustment, any effect upon the antidumping margins was negated by its tax related circumstances-of-sale adjustment to FMV, *i.e.* 19 U.S.C. § 1677b(a)(4)(B). *Defen-*

*dant's Memorandum In Opposition*, at 35. According to the ITA, such an adjustment was necessary because it calculated the amount of VAT forgiven upon USP (which is different than the Korean home market price). As a result, the imputed tax added to USP was different than the amount of VAT added to foreign market value. The ITA states that the circumstances-of-sale adjustment negates the effect of this difference in the amount of the tax by subtracting from FMV the difference between the tax charged on the home market sale and the tax adjustment added to the U.S. sale. *Id.* at 35–36.

Section 1677a(d)(1)(C), the section dealing with tax adjustments, does not provide for any adjustment to FMV to correct for tax-related distortion of the dumping margin. *See Zenith Electronics Corporation v. United States*, 988 F.2d 1573, (Fed.Cir.1993) (*Zenith II* ). As the court noted in *Zenith II* (*quoting Zenith Electronics Corporation v. United States*, 10 CIT 268, 276, 633 F.Supp. 1382, 1389–1390, (1986) (*Zenith I* )), the sole provision of title 19 expressly addressing adjustment for home market taxes does not allow adjustments to FMV, only to USP. Thus, the language of title 19 provides specifically for tax adjustments to USP. *Zenith II*, at 1580. Moreover, the specific provision of title 19 for tax adjustments does not permit changes to FMV.

The court in *Zenith II*, found that the legislative history of the Antidumping Act confirms that adjustments to USP are the sole statutory allowance for forgiven taxes. During the process leading to enactment of the Act, the House of Representatives approved a provision which defined FMV to exclude excise taxes levied in the home market. *See* 61 Cong.Rec. 254 (1921). The Senate rejected the House definition and instead defined FMV to include these taxes. *See* S.Rep. No. 16, 67th Cong., 1st Sess. 2–3 (1921). The Senate's provision, however, allowed upward adjustment of USP to prevent a dumping margin from arising solely due to a foreign government's forgiveness of taxes on exports. *See* S.Rep. No. 16 at 2, 12. Subsequently, the House–Senate Conference Committee responsible for reconciling the bills from the separate houses of Congress

adopted the Senate provision and this version became law. The Antidumping Act, ch. 14 §§ 203, 204, 42 Stat. 9, 12–13 (1921) (codified at 19 U.S.C. §§ 1677a(d)(1)(C), 1677b (1988)). This Court therefore concludes that Congress specifically rejected accounting for VAT taxes in FMV, opting instead to adjust USP.

Similarly, the language and context of the general circumstances-of-sale provision, *i.e.* 19 U.S.C. § 1677b(a)(4)(B), do not permit that section to override the express language of 19 U.S.C. § 1677a(d)(1)(C) for tax adjustments. The ITA made a circumstances-of-sale adjustment to negate any difference between Korean VAT and the VAT tax adjustment. However, the circumstances-of-sale provision contains no reference to taxes and therefore, neither the Court or the agency is empowered to apply one. In addition, ITA's application of the circumstances-of-sale provision, to adjust FMV for VAT taxes nullifies the USP-adjusting operation of section 1677a(d)(1)(C). The ITA improperly interpreted the general circumstances-of-sale language to allow it to write the specific tax adjustment section out of the statute.

19 U.S.C. § 1677b(a)(4)(B) only permits adjustments to FMV to accommodate "differences in circumstances-of-sale." *Zenith II*, at 1581. Yet the ITA has applied section 1677b(a)(4)(B) essentially to correct for the multiplier effect. The multiplier effect is a dumping margin variance caused by operation of the antidumping laws, not by a difference in the circumstances-of-sale.[2] By engaging in dumping, Cheil and SKC are responsible for the multiplier effect. The mul-

tiplier effect does not create a dumping margin where one does not exist. Only when pre-tax FMV exceeds USP and a foreign nation assesses an *ad valorem* commodity tax does section 1677a(d)(1)(C) operate to accentuate the dumping margin. *Id.*

As the Supreme Court emphasized in *Board of Governors v. Dimension Financial Corporation*, 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986):

The "plain purpose" of legislation ... is determined in the first instance with reference to the plain language of the statute itself.... Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.

*Board of Governors*, at 373–374, 106 S.Ct. at 688–689.

"The methodology plainly commanded by 19 U.S.C. 1677a(d)(1)(C) embodies the degree of tax neutrality Congress sought to implement and may not be disregarded by the ITA on the ground that some other method would produce a 'fairer' comparison, *see id.*; *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1954, 64 L.Ed.2d 611 (1980), or would be more 'reasonable' or 'efficient'. *See United States v. H. Rosenthal Co.*, 67 CCPA 8, 609 F.2d 999, 1001–02 (1979). Only Congress, not Commerce, may effect such a revision." *Zenith Electronics Corporation v. United States*, 10 CIT 268, 280, 633 F.Supp. 1382, 1392, (1986) (*Zenith I*).

---

2. The multiplier effect can be seen in the following example taken from *Zenith Electronics Corp v. United States*, 10 CIT 268, 273 n. 9, 633 F.Supp. 1382, 1386 n. 9 (1986), *appeal dismissed*, 875 F.2d 291 (Fed.Cir.1989):

Suppose the pre-tax home market price for a certain model of Japanese television is equal to $100, while the purchase price for the same model when sold for export to the United States is $90. In this tax-free comparison, the absolute margin of dumping would be $10 ($100–$90) and the ad *valorem* margin would be 11.1% ($10/$90).

Since the Japanese commodity tax is 15%, the tax on the home market sale equals $15 (15% of $100). If we assume that this tax is fully shifted forward to the home market pur-

chaser, then the after-tax home market price equals $115. By contrast, the amount of tax rebated or not collected on the exported television because it was sold for export would equal only $13.50 (15% of 90). Hence, if the United States price were increased by this latter amount, in accordance with the terms of 19 U.S.C. § 1677a(d)(1)(C), the adjusted calculation of USP would be $103.50 ($90 + $13.50). The absolute margin, determined by subtracting the adjusted USP from the after-tax home market price, would be $11.50 ($115 − $103.50), an amount greater than the $10 absolute margin calculated in the tax-free comparison, above. The *ad valorem* margin, however, would be identical, at 11.1% ($11.50/ $103.50).

In sum, the ITA applied the tax adjustment provision to remedy the tax-related differences between the home market and export sales. Subsequently, the ITA applied the circumstances-of-sale provision of the statute to correct the operation of the antidumping laws. The language of title 19 does not support this second step. ITA did not employ section 1677b(a)(4)(B) to remedy a dumping margin variance caused by a circumstances-of-sale, but a variance caused by operation of the trade laws.

Moreover, nothing in the enactment history of the circumstances-of-sale provision permits it to trump the express and specific statutory language covering tax adjustments. Rather, both the language and legislative history of this general provision provide Commerce with authority to adjust FMV for differences in circumstances-of-sale not specifically covered by other sections of title 19. *Id.* The Senate and House reports accompanying the 1958 circumstances-of-sale provision of the statute list only "differences in the terms of sale, credit terms, and advertising and selling costs" as circumstances warranting adjustments under the provision. S.Rep. No. 1619, 85th Cong., 2d Sess. 7 (1957). None of these items are covered by another section of the antidumping laws.

The Court holds that the circumstances-of-sale adjustment does not encompass adjustments for VAT specifically covered by section 1677a(d)(1)(C). Indeed, if this Court permits Commerce to use the circumstances-of-sale provision to account for forgiven value-added taxes, then section 1677a(d)(1)(C) would become completely superfluous. Accordingly, the Court remands this issue in order that the ITA recalculate the VAT adjustments in accord with section 1677a(d)(1)(C), not the general language of section 1677b(a)(4)(B). The general circumstances-of-sale provision of the statute, *i.e.* 1677b(a)(4)(B), does not govern when the trade laws expressly provide a more specific treatment for foreign taxes.

**3.** Commerce may also determine that a manufacturer and an importer are related pursuant to

### 3. Commerce's Determination that Cheil is Related to Samsung and Samsung America

■ Plaintiffs argue that the ITA improperly concluded that Cheil was related to Samsung Co., Ltd. in Korea (an exporter of Cheil film) and Samsung America in the United States (an importer of Cheil film) and consequently calculated the USP for Cheil's products based on sales by Samsung America. The applicable provision states:

(13) **Exporter.**—For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if—

(B) such person [importer] owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

19 U.S.C. § 1677(13)(B) (emphasis added)[3].

The ITA found that "the three entities are related in terms of common stock ownership, shared directors, and common management." *Plaintiffs' Brief,* at 37, *citing Final Determination: Polyethylene Terephthalate;* 56 Fed. Reg. at 16,314 (Comment 20). Because of the alleged relationship, the ITA determined that the price from Cheil to Samsung could not be used as the purchase price. Instead, USP for sales through Samsung America was calculated by using the prices charged by Samsung America to "unrelated" U.S. customers. Plaintiffs assert that the only evidence in the record supporting the ITA's finding consists of the following:

Cheil states that it is a member of the Samsung Group, a group of related companies under common management control. P.R. Document 90 at 4.

Samsung [ ] C.R. Document 83 at 3.

Samsung and Cheil share [ ]. C.R. Document 83 at 3.

Cheil asserts that [ ]. C.R. Document 83 at 4.

Cheil alleges that the [ ]. C.R. Document 83 at 4.

subsections (A), (C) or (D) of section 1677(13).

Plaintiffs argue that this evidence does not support the conclusion that the importer, Samsung America, "owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer." 19 U.S.C. § 1677(13)(B) (authorizing use of importer prices). Rather, only evidence of "actual financial linkage" may properly be considered. *Plaintiffs' Brief,* at 37–42.

Plaintiffs cite a number of determinations in which the ITA has found companies not to be related for antidumping law purposes despite similar relationships resembling those within the Samsung Group. *See Cellular Mobile Telephone and Subassemblies from Japan,* 54 Fed.Reg. 48,011 (Nov. 20, 1989) (not related under antidumping law despite being members of "the powerful Mitsubishi Group.") The ITA responds that the same findings listed by plaintiffs are sufficient to find that Samsung "owns or controls ... any interest in the business" of Cheil. The ITA is not constrained to examine only financial relationships in making the determination. Determinations cited by plaintiffs, such as *Cellular Mobile Telephones and Subassemblies from Japan,* in which the ITA declined to find that two members of a Japanese *Keiretsu* were related, merely stand for the proposition that the ITA is not required to examine a non-financial relationship to determine relatedness. They do not imply that the ITA cannot examine non-financial relationships. *Defendant's Memorandum In Opposition,* at 41.

The ITA quotes *Zenith v. United States,* 9 CIT 110, 114, 606 F.Supp. 695, 700 (1985), *aff'd Zenith v. United States,* 783 F.2d 184 (1986), in further support of its position: "the discernment of relationships which do not find expression in concrete financial terms is not something which can be posited as a mandatory duty, and is not required of the ITA by law." Because the *Zenith* Court did not *require* the above-noted methodology, its permissibility was implicitly condoned according to Commerce.

The Court finds the ITA's determination that Cheil is related to Samsung and Samsung America was reasonable. The require-ments of U.S. law were satisfied when the ITA investigated both financial and/or non-financial connections. The ITA properly considered and balanced those relationships which the law details in 19 U.S.C. § 1677(13)(B). Moreover, in view of the consideration listed by plaintiffs themselves, the ITA's determination on the question of relationship was supported by substantial evidence and was in accordance with law. Plaintiffs have failed to demonstrate a standard of practice from which Commerce has deviated.

### 4. Commerce's Determination that Cheil's USP Sales Constitute Purchase Price Transactions

■ In the alternative, plaintiffs argue that if the ITA's conclusion that Cheil was related to its importers was correct, then the ITA erred in treating the sales by Cheil's importers as "purchase price" rather than "exporter's sales price" transactions. *Plaintiffs' Brief,* at 44. Pursuant to 19 U.S.C. § 1677a(a), the "USP" of imported merchandise is to be calculated using either the purchase price or the exporter's sales price of the merchandise, depending upon the specific facts regarding the sale. "[T]he term 'purchase price' means the price at which merchandise is purchased or agreed to be purchased prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States ..." 19 U.S.C. 1677a(b). "[T]he term 'exporter's sale price' means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter ..." 19 U.S.C. § 1677a(c). The antidumping law attempts to construct value on the basis of arm's length transactions. The arm's length sale takes place at different points in the chain of commerce depending on whether the goods traveled through a related importer or through an independent, unrelated importer. Thus different methods of computation of USP are required depending on the relationship of the importer to the foreign producer. *Smith–Corona Group v. United States,* 1 Fed.Cir.(T) 130, ——, 713 F.2d 1568, 1572 (1983). "Where the importer

is related, an arm's length transaction does not occur until the goods are resold to a retailer or to the public. In that case, 'exporter's sales price' is used." *Id.*

Plaintiffs state that the ITA determined that Cheil's sales should be treated as purchase price transactions "because all sales were made directly to unrelated parties prior to importation into the United States." *Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,306. Yet, plaintiffs argue, this Court has held that the determination of whether to use exporter's sales price or purchase price in such situations cannot be based solely on the timing of the sales. *PQ Corp. v. United States,* 11 CIT 53, 60, 652 F.Supp. 724, 731 (1987). Additional facts to be evaluated include whether the merchandise was shipped directly without being inventoried by the selling agent, whether this was a customary channel for sales, and whether the related selling agent acted only as a processor of documentation and a communication link. *Plaintiffs' Brief,* at 46.

Plaintiffs argue Samsung and Cheil do not meet this test, because Samsung is intimately involved in all aspects of Cheil's U.S. sales, leaving only a minor role to Cheil. *See Id.* at 47. Customers send purchase orders directly to Samsung America. *Verification Exhibit 5–1,* Reel 8, Frame 363. Samsung America sends a sales invoice directly to the customer. *Id.* at Frame 365. Samsung America is invoiced directly and pays the shipping company for miscellaneous shipping fees and inland freight. *Id.* at Frames 366 and 367. Samsung America is the importer of record of PET film. *Id.* at Frame 372. Samsung incurs warehouse fees on some sales, and receives payment from the customer. *Verification Exhibit 5–10,* Reel 8, Frame 589, *Verification Exhibit 5–1,* Reel 8, Frame 373. Samsung America sells PET film in the U.S. at a substantial mark-up over the price at which it was purchased for export in Korea by Samsung. *Verification Exhibit 5–1,* Reel 8, Frame 390. Other substantial aspects of

Samsung's involvement in Cheil's U.S. sales are detailed in *Plaintiffs' Confidential Brief,* at 48–49. In contrast, plaintiffs argue that Cheil performed only administrative and procedural functions of packing the film, obtaining export permits, claiming drawback and arranging Korean transportation. Cheil may be able to decline to sell at a particular price, but there is no evidence that Samsung communicated with Cheil before accepting an order. *Id.* at 50–51.

The ITA agrees that sales to a related importer in the United States are usually exporter's sales price transactions. However, the ITA notes that when a sale to a related importer meets the additional criteria listed by plaintiffs (merchandise not inventoried by importer, direct shipment was a customary channel for this customer, and related agent acted only as a processor of documentation), it will be treated as a purchase price transaction. Plaintiffs do not dispute the fact that Cheil's United States sales were made before the PET film was imported in the United States. The ITA argues that Cheil was greatly involved in the PET film sales at issue. Cheil negotiated price and basic sales terms directly with each U.S. customer and for each U.S. sale. P.R. Document 269 at 10; P.R. Document 90 at 11. These prices automatically included [ ] C.R. Document 83 at 11. After prices and sales terms were negotiated, a customer would send a purchase order to Samsung America which then forwarded the order to Cheil. P.R. Document 90 at 11. However, only Cheil could accept or reject an order. *Id.* Cheil also assumed the commercial risks that accompanied its U.S. sales [ ] C.R. Document 83 at 25. The ITA found that neither Samsung or Samsung America could accept or reject an order, nor did they have the authority to set the U.S. customer's price. Lastly, PET film was usually shipped directly from Cheil to the U.S. customer without entering the inventory of Samsung or Samsung America.[4] *Defendant's Memorandum In Opposition,* at 46.

4. The record indicates that an exception to this general rule occurred when [ ] C.R. Document 83 at 24. Commerce has held that if a related importer must warehouse a shipment to

meet the needs of a specific customer then the merchandise does not enter the importer's inventory. Cellular Mobile Telephones and Subassemblies from Japan; Preliminary Results of Anti-

The ITA distinguishes *PQ Corp.* because the Court in that case found no evidence of direct contacts or agreements between the producer and ultimate purchaser of the merchandise. Further, the importer in *PQ Corp.* established the terms of sale independently from the producer, unlike the present case. Therefore, according to the ITA, the application of the *PQ Corp.* standard actually supports its present determination.

The evidence presented in the administrative record indicates that Samsung and Samsung America acted as mere conduits, or sales agents, for direct sales of merchandise from Cheil to the unrelated U.S. purchaser. The record shows that Cheil entered into agreements directly with the unrelated U.S. purchaser. In addition, there is no indication in the record that Samsung or Samsung America was involved in actually setting or approving Cheil U.S.'s sales price to the unrelated U.S. purchaser.

For these sales, the Court affirms the ITA's determination that purchase price is the appropriate basis for U.S. price based on the following elements: 1) The PET film in question was not usually introduced into the inventory of Samsung or Samsung America; 2) The fact that the vast majority of Cheil's U.S. PET film shipments were not warehoused by Samsung or Samsung America indicates that direct shipments of PET film from Cheil to U.S. customers were a customary commercial channel of sales; and 3) Samsung or Samsung America acted as only a processor of sales-related documentation and as a communication link with Cheil.

In light of these circumstances, the Court regards the routine selling functions of Cheil as merely having been relocated geographically from the country of exportation to the U.S., where Samsung and Samsung America performs them. Whether these functions take place in the U.S. or abroad does not change the substance of the transactions or the functions themselves. The Court therefore finds that the ITA's decision to consider Cheil's U.S. sales through Samsung and Samsung America as purchase price transactions was reasonable.

dumping Duty Administrative Review, 54 Fed.

### 5. Commerce's Deduction of SKC's Home Market Indirect Selling Expenses From SKC's FMV Up To The Amount Of SKC's U.S. Sales Commission Expenses.

■ Plaintiffs challenge the ITA's implementation of 19 C.F.R. § 353.56(b) (1991) which sets out a special rule allowing an adjustment to FMV when a respondent pays sales commissions on sales in the United States but pays no commissions on sales in the home market. Essentially, plaintiffs argue that the ITA improperly reduced SKC's FMV by deducting home market indirect selling expenses up to the amount of U.S. commissions reported, despite the lack of any comparison between them. 19 C.F.R. § 353.56(b)(1) provides in part,

> The Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, but the Secretary will limit the amount of such allowance to the amount of other selling expenses incurred in the other market or the commissions allowed in the other market, whichever is less.

Plaintiffs contend there is no evidence in the record to show that the commissions in question were in any way a substitute for indirect selling expenses that would otherwise have been incurred by SKC. In this case, the ITA verified that SKC incurred sales commission expenses on [ ] purchase price sales in the United States, C.R. Document 87 at 32, and that SKC incurred indirect selling expenses from home market sales. *Id.* at 25. SKC incurred no sales commission expenses from Korean sales. As a result, in accordance with 19 C.F.R. § 353.56(b)(1), the ITA "allowed an offset [SKC's FMV] amounting to the lesser of the weighted-average home market indirect selling expenses, or the U.S. commissions." *Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,307.

Reg. 48,922, 48,922 (Nov. 28, 1989).

In the final determination, the ITA stated that the purpose of the commission offset is to adjust for indirect selling expenses incurred in lieu of payments to a commissionaire who would incur similar expenses, and that there is no requirement that the indirect expenses be comparable to the commissions. *Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,310 (Comment 7). Plaintiffs insist that the ITA does not fulfill its statutory mandate to calculate FMV by merely assuming there is no requirement that the indirect expenses be comparable to the commissions. Plaintiffs claim that the ITA standard of maintaining that the expenses are "similar" but not "comparable", is contradictory by its own terms. *Plaintiffs' Brief* at 57.

The ITA responds that the plaintiffs' argument is contrary to administrative practice and 19 C.F.R. § 353.56(b)(1). Indeed, the ITA has previously found that one market's indirect selling expenses do not have to be comparable to the sales commission expenses of the other market for Commerce to offset the indirect selling expenses. *Titanium Sponge from Japan; Final Results of Antidumping Duty Administrative Review,* 52 Fed.Reg. 4,797, 4,799 (Feb. 17, 1987).

The Court finds that there is no basis in the statute or the regulations for requiring the ITA to determine if the indirect selling expenses incurred in one market are "comparable" to the sales commissions expenses incurred in another market before it may make an adjustment under 19 C.F.R. § 353.-56(b)(1). In addition, it has been the ITA's consistent practice to treat the offset for sales commissions in only one market in the manner it has in this case. *See, e.g., Final Results of Anti-dumping Duty Administrative Review and Revocation in Part: Titanium Sponge from Japan,* 57 Fed.Reg. 557, 558 (1992); *Final Results of Antidumping Duty Administrative Review; Certain Fresh Cut Flowers from Mexico,* 56 Fed.Reg. 1,794, 1,796–97 (1991); *Final Determination of Sales at Less Than fair Value; Industrial Nitrocellulose from the United Kingdom,* 55 Fed.Reg. 21,055, 21,056 (1990). Moreover, plaintiffs make no reference to the administrative record to show that antidumping margins were artificially lowered due to ITA's treatment of commission offset for U.S. sales commissions.

In the absence of explicit statutory guidance, the ITA's interpretation of the statute is given deference under the traditional *Chevron* standard of review. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 844–845, 104 S.Ct. 2778, 2782–2783, 81 L.Ed.2d 694 (1984). The ITA verified that there were selling expenses to offset against commissions paid in the U.S. market. Therefore, the Court cannot hold that the ITA's decision was unreasonable or otherwise not in accordance with law. The Court affirms the ITA's adjustment to FMV for U.S. sales commissions paid on ESP sales.

### 6. *Commerce's Decision To Accept SKC's Product Specific Cost Accounting Methodology.*

 Plaintiffs argue that the ITA improperly calculated SKC product-specific production costs by relying on data that was not a part of SKC's normal accounting and therefore arbitrarily allocated costs among different products. SKC's normal accounting system records a single uniform cost for all PET film, representing the average cost of production for a given period. *Plaintiffs' Brief,* at 59. Product-specific costs are not calculated for either cost accounting purposes or for inventory purposes. When film is removed from inventory *i.e.* for sale, a uniform cost is also used, regardless of film type. *See Report on Cost of Production and Constructed Value Verification of SKC Limited,* March 19, 1991 at 13–14, C.R. Document 100, Reel 4, Frames 1349–50. SKC described this system as being in accord with Korean GAAP, and the ITA made no contrary finding. *See Questionnaire Response of SKC Limited and SKC America, Inc.,* Section A, July 10, 1990, Appendix A–11 at 1, C.R. Document 19, Reel 3, Frame 605. For purposes of this investigation, SKC used a different method to construct product specific costs. Despite "a legion" of potential errors identified by the ITA, the ITA accepted this method. *Plaintiffs' Brief* at 59–60; C.R. Document 100, Reel 4, Frames 1337–38.

Plaintiffs assert that this reliance on the different method conflicts with the ITA's longstanding policy of using the actual costs recorded in a respondent's books if the books are kept in accordance with local GAAP. *See Camargo Corrêa Metais, S.A. v. United States,* —— CIT ——, Slip Op. 93–163, at 3, 1993 WL 366964 (August 13, 1993).

Plaintiffs allege that none of the data used in the hypothetical cost accounting can be traced to a record that is part of the company's accounting system or is subject to an external audit. For example, an important figure, the usage rate for virgin PET chips, is based on production slips that are not a normal part of SKC's accounting system. As an alternative, plaintiffs argue that the cost of production should be based on SKC's average film value records, because the key costs of producing film are the same regardless of the film type. Each pound of film contains the same basic ingredients. *Plaintiffs' Brief,* at 63.

The ITA responds that SKC informed the ITA that it did not keep product specific costs records, but that such figures could be derived using a standard PET film chip usage rate for each type of film. The rate was calculated by determining the length of time spent extruding a particular film and multiplying that figure by the rate at which the polymer was extruded. From this, SKC determined the total volume extruded during each run, and thus the amount of chips used. The ITA verified the reliability and accuracy of this method by tracing the figures back to the daily "winder production slips" (explained in detail in *Defendant's Memorandum In Opposition,* at 56–57) used in the calculation, and SKC's raw material ledger. C.R. Document 100 at 15, 16, 21–23, *SKC Cost Verification Exhibits* 4, 16–18, and 31. Comparing costs, the ITA found that the results conformed with SKC's regularly kept business records.

In addition, the ITA argues it was required to accept SKC's product specific accounting methods under *Ipsco, Inc. v. United States,* 13 CIT 402, 714 F.Supp. 1211 (1989). *Defendant's Memorandum In Opposition,* at 54. As noted below, *Ipsco* was subsequently reversed. In a letter submitted to the Court after briefs were filed, the government conceded the necessity of revisiting the issues for which it relied heavily on *Ipsco.* In light of the development, the Court remands this issue with instruction that the ITA comment on the effect of *Ipsco's* reversal upon its choice of accounting methodology discussed above.

7. *The Methodology Used by Commerce To Allocate SKC's And Cheil's Production Costs Between Off–Grade And PET Film*

In its investigation, Commerce determined that both Cheil and SKC sold some products, including off-grade film, in the home market at prices below the cost of production. *See Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. 16,307, 16,308. In its final determination, the ITA calculated the cost associated with Cheil's and SKC's production of certain off grade film by taking the average per kilogram cost of PET film production for each company during the period of investigation and then allocating costs between prime grade and off-grade products on the basis of their relative selling prices. 56 Fed.Reg. at 16,311–12, 16,315–16. Commerce justified its decision by reference to a similar value-based cost allocation methodology accepted by this Court in *Ipsco, Inc. v. United States,* 13 CIT 402, 714 F.Supp. 1211 (1989).

The Plaintiffs argue that the ITA's decision to follow the methodology is flawed in several respects. First, despite the heavy reliance placed on *Ipsco* by respondents from the outset of the investigation, neither respondents nor Commerce developed an adequate factual basis for invoking *Ipsco. Plaintiffs' Brief,* at 66–67. Second, even if a factual record existed to support resort to value-based cost allocations, the approach used in the contested determination is contrary to the purpose of the statute and to *Ipsco.* Finally, the underlying defects in the cost data accepted by the ITA are so severe that even if *Ipsco* could be properly invoked, the results reached by it in this investigation would still be flawed. *Id.*

Both plaintiffs and the ITA have made extensive arguments concerning the calcula-

tion of the cost of off-grade films based on *Ipsco, Inc. v. United States,* 13 CIT 402, 714 F.Supp. 1211 (1989), *reversed,* 965 F.2d 1056 (1992). *Ipsco* was reversed after briefs in this case were submitted. In a letter to the Court dated September 8, 1992, the government concedes that "a remand is appropriate solely for the purpose of revisiting Commerce's choice of methodology for calculating the production costs incurred by SKC and Cheil in producing off-grade finished PET films." Accordingly, this issue is remanded for consideration by Commerce in light of the reversal of *Ipsco.*

### 8. *Commerce's Decision To Accept Cheil's Method of Accounting For Recycled Scrap Film.*

Both Cheil and SKC recycle scrap film created by the production of the PET film. The film is crushed and compacted into "pellets" which are then added together with "virgin" pellets in different combinations to produce different types of PET film. During the ITA's cost of production investigation, Cheil stated that its cost accounting methodology for the calculation of recycled scrap film costs relied upon the recycled scrap film's "net realized value." In the final determination, the ITA agreed to accept Cheil's material costs for recycled scrap film because the costs "recognized the market value of the scrap film pellets, as well as their influence on the value of the finished PET film." *Final Determination: Polyethylene Terephthalate;* 56 Fed.Reg. at 16,316.

Plaintiffs argue that the ITA should have rejected Cheil's material costs for recycled scrap film because net realizable value methodology is prohibited by *Ipsco.* Specifically, if net realizable value is used to determine the cost of PET film materials, then it has a direct effect on the costing of inputs that are a critical element of cost of production and constructed value, and should thus be viewed as improper under the Court's analysis in *Ipsco.* Plaintiffs' argument concerns the calculation of the cost of recycled scrap film

based upon *Ipsco.* Accordingly, Commerce's decision to accept Cheil's method of accounting for recycled scrap is remanded in light of *Ipsco's* reversal.

### 9. *Commerce's Determination That Cheil Reported All Direct And Indirect Costs Incurred From "Reslitting" Certain PET Film*

■ Finally, plaintiffs argue that the ITA neglected to include costs for depreciation, energy, factory overhead, and waste associated with "reslitting" certain PET film. The record shows that there are a number of processing steps required to produce PET film. Raw materials are first processed into PET film chips. The chips are then melted together and extruded into sheet film. The sheet film then undergoes at least two stretching operations to impart to it strength and unique physical properties. The stretched film is crystallized before undergoing edge trimming and winding into "mill rolls." Scrap material is crushed and returned to the beginning of the production process. The PET film produced by Cheil is slit into customer-specified lengths and widths before sale. C.R. Document 90 at 6. However, [ ] PET film that is sold in the United States is reslit a second time into narrower widths. C.R. Document 83 at 16. Plaintiffs contend that the ITA did not include the full cost of reslitting in its constructed value computation.[5] Rather, the ITA accounted for reslitting of certain exports to the United States by making a circumstance of sale adjustment to the foreign market value of unslit film by adding the variable cost of slitting. This adjustment, according to plaintiffs, included only variable labor costs, and erroneously neglected depreciation, energy, scrap loss, and factory overhead. *Plaintiffs' Brief,* at 88–89.

The ITA responds that costs for electricity, overhead and depreciation associated with reslitting were already included in the constructed value of the PET film. *Defendant's*

---

5. **(e) Constructed value**
 **(1) Determination**
 For the purpose of this subtitle, the constructed value of imported merchandise shall be the sum of—

 **(A)** the cost of materials … and of fabrication or other processing of any kind employed in producing such or similar merchandise …;
 19 U.S.C. § 1677b(e)(1)(A).

*Memorandum In Opposition,* at 72. Cheil had [ ] PET film production lines. C.R. Document 90 at 8. For each production line, all of the costs incurred from operating the production line's equipment associated with production were captured. *Id.* at 18–21. Therefore, all of the costs of operating the slitting machines, whether for initial slitting or reslitting were recorded by Cheil and were subsequently allocated by the ITA to each PET film line's constructed value. *Defendant's Memorandum In Opposition,* at 72.

Upon due consideration, the Court finds the ITA's methodology adequately captured the disputed costs of factory overhead, depreciation, and energy. No adjustment was needed for the cost of waste produced from reslitting because edge trimmings were recycled into pellets. C.R. Document 99 at C183 and C190–191. Plaintiffs' characterization that these costs were not accounted for does not stand up in the face of the ITA's explanation. Plaintiffs have not provided any authority that the ITA was required to segregate the costs of the unslit film from the slit film for any or all of the production lines. More importantly, as the ITA has asserted, the costs of producing both widths were captured in the constructed value—which for example included the total energy cost of operating the factory for production of both widths of film. Therefore, no "additional" value was lost by the failure to segregate. Accordingly, the ITA's determination that Cheil's direct costs associated with reslitting [off-grade PET film] were fully accounted for by Cheil is supported by substantial evidence contained in the administrative record and is otherwise in accordance with law.

## CONCLUSION

For the foregoing reasons, this case is remanded in part to the ITA. On remand, the ITA is instructed to recalculate the value-added tax adjustments in accord with 19 U.S.C. § 1677a(d)(1)(C) and not the general language of section 1677b(a)(4)(B) in accordance with this opinion. The ITA is directed to reexamine it's choice of methodology for calculating the production costs incurred by SKC and Cheil in producing off-grade fin-

ished PET films in light of *Ipsco's* reversal. The ITA is further directed to reexamine it's choice of cost accounting methodology for the calculation of Cheil's recycled scrap film in light of *Ipsco's* reversal. Finally, the ITA is directed to reexamine or comment on the effect of *Ipsco's* reversal upon its choice of SKC's product specific cost accounting methodology.

## ORDER

Upon consideration of the motions of the plaintiffs for judgment upon the agency record, and other papers filed in this action, and after oral argument, it is hereby

**ORDERED** that this case is remanded to the International Trade Administration; and it is further

**ORDERED** that the ITA shall recalculate the VAT adjustments to USP in accordance with the requirements of 19 U.S.C. § 1677a(d)(1)(C), not the general language of 19 U.S.C. § 1677b(a)(4)(B); and it is further

**ORDERED** that the ITA shall reexamine its choice of methodology for calculating the production costs incurred by SKC and Cheil in producing off-grade PET films in light of the reversal of *Ipsco, Inc. v. United States,* 714 F.Supp. 1211 (CIT 1989), *reversed,* 965 F.2d 1056 (1992); and it is further

**ORDERED** that the ITA shall reexamine it's choice of cost accounting methodology for the calculation of Cheil's recycled scrap film in light of *Ipsco's* reversal; and it is further

**ORDERED** that ITA shall reexamine or comment on the effect of *Ipsco's* reversal upon it's choice of SKC's product specific cost accounting methodology; and it is further

**ORDERED** that the ITA shall report the results of this remand to the Court within ninety days of the date of this order.