ZENITH ELECTRONICS CORP., ET AL., PLAINTIFFS *v.*
UNITED STATES, DEFENDANT

Consolidated Court No. 88–07–00488

(Dated September 19, 1994)

*Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel* and *Joseph A. Perna, V)* for plaintiff Zenith Electronics Corporation.

*Collier, Shannon, Rill & Scott (Paul D. Cullen, Jeffrey S. Beckington, Mary T. Staley, David C. Smith, Jr.* and *Gail S. Usher)* for plaintiff-intervenors Independent Radionic Workers of America, the International Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers (AFL-CIO) and the Industrial Union Department (AFL-CIO).

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Velta A. Melnbrencis), Priya Alagiri,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Sukhan Kim, Warren E. Connelly. P.C.* and *Margaret L.H. Png)* for defendant-intervenors Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

OPINION

RESTANI, *Judge:* This matter is before the court on three motions pursuant to USCIT Rule 56.2 for judgment upon the agency record. The motions have been brought by (1) the Independent Radionic Workers of America, the International Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers (AFL-CIO) and the Industrial Union Department (AFL-CIO) (collectively "the Unions"), (2) Zenith Electronics Corporation, and (3) Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung"). The court has consolidated these separate challenges to the determination of the International

───

Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") in *Color Television Receivers from Korea,* 53 Fed. Reg. 24,975 (Dep't Comm. 1988) (third final admin. review).

## STANDARD OF REVIEW

As this consolidated action constitutes a challenge to the final determination of an administrative review, the applicable standard of review is whether the final determination is supported by substantial evidence on the record and is otherwise in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## DISCUSSION

### I. *Adjustment for Value-added Taxes:*

In its final determination, Commerce added the amount of home market value-added taxes ("VAT") forgiven by reason of export to United States price ("USP") in accordance with 19 U.S.C. § 1677a(d)(1)(C) (1988). 53 Fed. Reg. at 24,976. To offset the VAT adjustment, Commerce made circumstance of sale ("COS") adjustments to foreign market value ("FMV"). *Id.*

Zenith and the Unions argue that the Federal Circuit's decision in *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1581 (Fed. Cir. 1993), forbids a "neutralizing" COS adjustment.[1] *See also Avesta Sheffield, Inc. v. United States,* 838 F. Supp. 608, 614 (Ct. Int'l Trade 1993) (remanding for recalculation of FMV with no COS adjustment). Commerce and Samsung agree.

Pursuant to its new methodology, Commerce applies the home market tax rate to the exported merchandise at the same point in the U.S. chain of commerce at which the foreign tax was applied to home market sales. *See Ferrosilicon from Brazil,* 59 Fed. Reg. 732, 733 (Dep't Comm. 1994) (final determ. of sales at less than fair value ("LTFV")). Commerce then "adjust[s] the USP tax adjustment and the amount of tax included in FMV" to account for expenses deducted in calculating FMV and USP. *Id.* This methodology was upheld in *Torrington Co. v. United States,* 854 F. Supp. 446, 448–49 (Ct. Int'l Trade 1994). Although Samsung protests the application of this new methodology on the ground that the Federal Circuit has not yet upheld it, the court sees no point in revisiting the issue. The court accepts Commerce's acknowledgement of its error and remands the determination for Commerce to account for VAT in accordance with its new methodology.[2]

---

[1] The Federal Circuit in *Zenith* stated,

Congress specifically rejected accounting for foreign commodity taxes in FMV, opting instead to adjust USP. Therefore, the trial court correctly directed Commerce to recalculate the dumping margins and duties * * * without adjustments to FMV.

988 F.2d at 1581.

[2] The Unions withdrew their claim regarding ITA's failure to measure the amount of tax passed through to home market consumers after the Supreme Court declined to review *Daewoo Elecs. Co. v. United States,* 6 F.3d 1511, 1517 (Fed. Cir. 1993), *cert. denied,* 114 S. Ct. 2672 (1994).

II. *Adjustments for Antidumping Duties:*

Zenith contends that antidumping duties actually paid or to be paid should be deducted from USP pursuant to 19 U.S.C. § 1677a(d)(2)(A) and § 1677a(e)(2) (1988).[3] Zenith also cites to Commerce's reimbursement regulation, in effect at the time, which provides for the deduction

> of any antidumping duties which are, or will be, paid by the manufacturer, producer, seller, or exporter, or which are, or will be, refunded to the importer by the manufacturer * * * either directly or indirectly.

19 C.F.R. § 353.55(a) (1988). It argues that payment of antidumping duties by a related importer is equivalent to payment by the producer directly on behalf of the importer.

Commerce and Samsung raise the defenses of failure to exhaust administrative remedies and failure to plead the issue in the complaint. In response to the preliminary results, Zenith commented that ITA "should reduce the USP by the amount of estimated antidumping duties." 53 Fed. Reg. at 24,978 (emphasis added). ITA disagreed. *Id.* Zenith now asserts that adjustments should be made for *actual* antidumping duties.

This court has differentiated between the issues of whether estimated or actual antidumping duties should be deducted from USP. In *PQ Corp. v. United States,* 11 CIT 53, 652 F. Supp. 724 (1987), the court stated,

> [i]t was not improper for ITA to not make any adjustments * * * for *deposits* of estimated antidumping duties * * *. Because ITA found no margin, there were no *actual* duties to deduct. The determination upon remand, however, may result in a finding of dumping, in which case the separate issue of whether actual duties should be deducted in calculating final margins may arise.

*Id.* at 68, 652 F. Supp. at 737 (footnote omitted). Therefore, by addressing the issue of only estimated duties at the administrative level, Zenith did not exhaust its remedies as to a deduction for actual duties.[4]

Zenith also failed to plead the issue properly in its complaint. *See* USCIT Rule 8(a) ("A pleading * * * shall contain * * * a short and plain statement of the claim showing that the pleader is entitled to relief"). The complaint alleges that ITA erred by failing to account for estimated antidumping duties. Compl. ¶ 5(q). Zenith's motion to amend its complaint to add a claim for the deduction of actual antidumping duties was

---

[3] Section 1677a(d)(2)(A) provides that USP shall be reduced by

the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States * * *

19 U.S.C. § 1677a(d)(2)(A). Section 1677a(e)(2) provides that the exporter's sales price ("ESP"), a type of USP, shall be reduced by the amount of "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." *Id.* § 1677a(e)(2).

[4] The court does not accept Zenith's position that it falls under two exceptions to the exhaustion requirement—where the new argument is purely legal and where it would have been futile to raise the issue before the agency. *See Budd Co. v. United States,* 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991). Because Zenith requests a remand which will require new factual findings, the issue is not purely legal. *See id.* at 452, 773 F. Supp. at 1555. Zenith's futility argument rests on the results in one administrative determination, which does not suffice to show Commerce's immovable stance on the issue. *See Koyo Seiko Co. v. United States,* 16 CIT 539, 544, 796 F. Supp. 1526, 1531 (1992).

denied. *Zenith Elecs. Corn. v. United States,* Consol. Ct. No. 88–07–00488 (Ct. Int'l Trade July 22, 1994) (order denying Zenith's motion to amend complaint). Because Zenith neither exhausted its administrative remedies nor raised the issue properly before this court, the court will not reach the merits of Zenith's argument.

III. *Treatment of Certain Sales as Purchase Price or Exporter's Sales Price Transactions:*

The Unions contend that Commerce presumed that certain of Samsung's sales, negotiated prior to importation, were purchase price ("PP") transactions. According to the Unions, Commerce failed to require proof that the sales were PP transact ions and ignored evidence showing that the sales were clearly not PP transactions.

The statute defines USP as "the purchase price ["PP"], or the exporter's sales price ["ESP"], of the merchandise, whichever is appropriate." 19 U.S.C. § 1677a(a) (1988). The PP is "the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation." *Id.* § 1677a(b) (1988). The ESP is "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter." *Id.* § 1677a(c) (1988).

Prior to this court's decision in *PQ Corp.,* Commerce's consistent practice was to delineate between PP transact ions and ESP sales based upon when they were completed. 11 CIT at 60 & n.8, 652 F. Supp. at 731 & n.8. In *PQ Corp.,* the court held that "[t]he mere fact that a sale was made prior to importation does not provide a sufficient basis for applying PP rather than ESP. * * * Thus, where a sale is made to an unrelated party prior to importation, the determination of whether PP or ESP applies must be based upon additional circumstances." *Id.* at 60, 652 F. Supp at 731.

In response to the holding of PQ Corp., Commerce developed the following three-part test:

> [(1)] the manufacturer must ship the merchandise directly to the unrelated buyer, without introducing it into the related selling agent's inventory. [(2)] This procedure must be the customary sales channel between the parties. [(3)] The related selling agent located in the United States must act only as a processor of documentation and a communication link with the unrelated buyer.

*Borusan Holding A.S. v. United States,* 16 CIT 278, 281 (1992) (footnote omitted). In the administrative proceedings at issue, Commerce applied this test to Samsung's sales,[5] finding that Samsung's indirect purchase price customers "are a distinct and separate group from its ESP customers." 53 Fed. Reg. at 24,980–81. Commerce accepted Samsung's state-

---

[5] The final determination refers to the test set forth in the preliminary results. 53 Fed. Reg. at 24,980. The preliminary results apply the test approved in *Borusan. Color Television Receivers from Korea,* 52 Fed. Reg. 17,617, 17,618 (Dep't Comm. 1987) (prelim. admin. review).

ment for the record that Samsung does not place merchandise for ESP customers in its U.S. subsidiary's inventory and that direct shipments are the customary channel of trade for these customers. *Id.* at 24,981. Commerce found no evidence that the U.S. subsidiary "functions as anything more than an agent for these sales." *Id.*

The Unions assert that a PP analysis is appropriate only where the U.S. subsidiary "at no time maintained an inventory from which sales were made." *Frozen Concentrated Orange Juice from Brazil,* 52 Fed. Reg. 8324, 8326 (Dep't Comm. 1987) (final determ. of LTFV sales) *("FCOJ").* They reason that Samsung does not meet this test because it reported ESP sales and therefore the subsidiary must have kept an inventory from which sales were made. The Unions' reasoning ignores the fact that Commerce found both PP and ESP transactions to have occurred in *FCOJ. Id.* The only way to reconcile the language in *FCOJ* with the result is to interpret the test as referring to an inventory from which *PP* sales were made.

Moreover, this court has found that merchandise has not been introduced into inventory even where the U.S. subsidiary temporarily held the merchandise in a warehouse before shipping it to the end purchaser. *See E.I. DuPont de Nemours & Co. v. United States,* 841 F. Supp. 1237, 1249–50 n.4, 1250 (Ct. Int'l Trade 1993); *Outokumpu Copper Rolled Prods. AB v. United States,* 829 F. Supp. 1371, 1379–80 (Ct. Int'l Trade 1993).

In Samsung's indirect purchase price ("IPP") sales, the manufacturer ships the merchandise to the subsidiary who, in turn, ships the merchandise from the port to the customer. Def.-Ints.' Mem. Supp. Mot. J. Agency R., Conf. App. B, Tab 2, at 13. Under the terms of sale, the merchandise is delivered or sent f.o.b. (freight-on-board) the applicable U.S. port. Joint Opp'n of Pl.-Ints. and Pl. to Def.-Ints.' Rule 56.2 Mot., Pub. R. App., Tab 2, at 2. In contrast, the ESP merchandise is delivered or sent f.o.b. the subsidiary's warehouse under a FIFO (first in, first out) inventory system. *Id.* at 1. These terms of sale constitute sufficient evidence for Commerce to conclude that Samsung's IPP merchandise was not introduced into its subsidiary's inventory, even though the subsidiary may have taken temporary possession of it at the port of entry.

The evidence also supports ITA's finding that direct shipments were a customary channel of sale for IPP sales. Samsung stated for the record that its IPP sales, which are sales of specific private label models, are not introduced into the subsidiary's inventory. Def.'s Partial Opp'n to Pl.-Ints.' Rule 56.2 Not., Pub. App., at 19. Furthermore, the fact that the private label model shipments "were not warehoused * * * indicates that direct shipments * * * to U.S. customers were a customary commercial channel of sales." *DuPont,* 841 F. Supp. at 1250.

The Unions request the court to find that Samsung's subsidiary did not function solely as a processor of documentation and a communication link because it invoiced customers, collected payments, acted as importer of record, paid customs duties, and may have taken title to the

goods when they arrived in the United States. The record shows only that Samsung's subsidiary took purchase orders and invoiced the customers. Def.-Ints.' Conf. App. B, Tab 2, at 13.[6]

In *DuPont,* customers sent purchase orders directly to the U.S. subsidiary, and the subsidiary sent invoices directly to the customers. 841 F. Supp. at 1249. The subsidiary also acted as importer of record and received payment from the customers. *Id.* Nevertheless, the court deemed the subsidiary to be a mere processor of documentation and a communication link. *Id.* at 1250. In *Outokumpu,* where the subsidiary took title to the exported merchandise and paid customs duties, the court nevertheless found that the sales were properly classified as PP transactions. 829 F. Supp. at 1379–80. Therefore, even if the court were to accept the Unions' allegations as true, Commerce's classification of Samsung's IPP sales as PP transactions is supported by substantial evidence on the record.

### IV. *Offset of Imputed Credit Expense Formula:*

In the third administrative review, ITA made a COS adjustment to account for Samsung's imputed credit expenses based on the average duration of accounts receivable. *See* 53 Fed. Reg. at 24,982. The Unions requested Commerce to offset the average duration of accounts receivable by the average duration of accounts payable.[7] *Id.* Commerce denied the Unions' request "for the reasons stated in our final results of the previous review." *Id.* In the previous review, Commerce stated that the Unions' suggested methodology "would require us to adjust for factors relating to cost of production, which are unrelated to the *sales* at issue." *Color Televisions Receivers from Korea,* 51 Fed. Reg. 41,365, 41,366 (Dep't Comm. 1986) (second final admin. results).[8]

In *Federal-Mogul Corp. v. United States,* 839 F. Supp. 881 (Ct. Int'l Trade 1993), the ITA determination under review did not calculate an offset for the delay in payment of home market selling expenses, *i.e.,* the duration of accounts payable. *Id.* at 884–85. The court sustained ITA's determination, holding that ITA "is not required to factor in the effects of delayed payment of home market selling expenses on these COS adjustments." *Id.* at 886. For this reason, and for the reasons stated in *Independent Radionic Workers v. United States,* Slip Op. 94–144, at 10–11 (September 16, 1994), the court sustains ITA's decision not to account for the average duration of accounts payable.

---

[6] Contrary to the Unions' assertion, the court does not find ITA's investigation deficient on this issue.

[7] The Unions have withdrawn their additional claim that Commerce erred in combining the commission offset with the ESP offset.

[8] Commerce further explained its reasoning in its brief before the court:

> [B]y allowing the customer a period of time to pay, the seller effectively reduces the sales price of the merchandise because of the time value of money. * * * To the extent that a manufacturer can delay paying its suppliers, the cost of materials is reduced by the time value of money, resulting in a saving in the cost of production. Since accounts payable are, thus, production costs, they cannot result in a circumstance-of-sale adjustment.

Def.'s Partial Opp'n to Pl.-Ints.' Rule 56.2 Not., at 18.

V. *Indirect Versus Direct Selling Expenses:*

A. Credit Sale Rebates

Samsung granted rebates to its home market distributors who sold to consumers on credit pursuant to a rebate program known as Shin Yong Pan Mae ("SYPM"). To calculate a per unit amount of the rebate, Samsung divided the total amount of rebates paid on the subject merchandise by the total amount of sales revenue for the subject merchandise. Def.-Ints.' Conf. App. B, Tab 2, at App. B–6. Samsung then multiplied the resulting percentage by the price of each individual home market sale under investigation.

In the first and second reviews, ITA denied a direct selling adjustment for the SYPM rebates on the ground that the timing of the post-sale rebates did not allow ITA to tie the rebates specifically to sales during the review period. *Color Televisions Receivers from Korea,* 51 Fed. Reg. at 41,377; *Color Television Receivers from Korea,* 49 Fed. Reg. 50,420, 50,427 (Dep't Comm. 1984) (first final admin. results). In contrast, the third administrative review results stated,

> the SYPM rebate program is not allowable as a circumstance of sale adjustment because Samsung cannot identify the rebate on a model specific basis. It is important that Samsung [sic] be able to identify the expense model-by-model because CTVs [color televisions] with different screen sizes will have differing credit experiences * * *. It is not adequate that Samsung identify the rebate expense distributor-by-distributor because we do not calculate the FMV on that basis.

53 Fed. Reg. at 24,986. Although ITA agrees that a remand is necessary to redress any inconsistency in the different reviews, Zenith and the Unions contest Samsung's claim that a model-specific allocation is not necessary.

The Federal Circuit has concluded that the use of an appropriate allocation methodology "does not deprive * * * rebates of their direct relationship to the sales under consideration." *Smith-Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed. Cir. 1983), *cert. denied,* 465 U.S. 1022 (1984).[9] The methodologies deemed appropriate by the Federal Circuit include not only "apportioning the expense among the various models sold and dividing by the quantity of each model sold," but also dividing the total amount of the rebate by the total sales quantity of subject merchandise. *Id.* In essence, Samsung applied the latter methodology, although it divided by total sales revenue rather than total sales quantity. Therefore, the SYPM rebates should be treated as direct selling expenses unless *Smith-Corona* is found not to apply.

This court has distinguished *Smith-Corona* in circumstances where (1) the manufacturer's actual cost data does not establish a direct link between a rebate and the sale of merchandise within the scope of inves-

---

[9] *See Independent Radionic Workers,* Slip Op. 94–144, at 14–16, for a more detailed discussion of the law on circumstance of sale adjustments and direct selling expenses in this context.

tigation and (2) rebates were not assessed as a fixed percentage of sales. *NSK Ltd. v. United States,* 843 F. Supp. 1503, 1505 (Ct. Int'l Trade 1994); *Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F. Supp. 1526, 1530 (1992).

In *NSK,* the court found that unless a manufacturer offers the same rebates on in-scope merchandise as on out-of-scope merchandise, allocating rebates over total sales per customer is inappropriate. 843 F. Supp. at 1505. The allocation formula used by Samsung divided CTV rebates by CTV sales. Def.-Ints.' Conf. App. B, Tab 2, at App. B- 6. Thus, it is product-specific rather than customer-specific and it establishes a direct link between the rebates and the sale of in-scope merchandise.

In *Koyo Seiko,* this court differentiated between rebates "granted as a straight percentage of sales, regardless of the models sold," which *Smith-Corona* considered to be direct selling expenses, and rebates that varied from product to product. *Koyo Seiko,* 16 CIT at 542–43, 796 F. Supp. at 1530. ITA attempts to characterize the SYPM rebates as varying according to product because "CTVs with different screen sizes will have differing credit experiences." 53 Fed. Reg. at 24,986. The operative question, however, is not whether different models have differing credit experiences but whether the rebate percentage rate varies from model to model. Samsung has supported its position that rebates were granted at a fixed percentage rate. Def.-Ints.' Conf. App. B, Tab 2, at App. B- 6. Therefore, the court grants the request of Commerce and Samsung for remand, but further instructs ITA to treat the SYPM rebates as direct selling expenses.[10]

B. Bad Debt Expense

In its brief before the court, Samsung claims that its bad debt expenses incurred during the period of review are entitled to treatment as direct selling expenses. This claim does not appear in Samsung's original complaint. On July 22, 1994, the court denied Samsung's motion to amend its complaint to add the allegation that ITA erred in its treatment of bad debt expenses. *Zenith Elecs. Corp. v. United States,* Consol. Court No. 88–07–00488 (Ct. Int'l Trade July 22, 1994) (order denying Samsung's motion to amend complaint). Samsung is thus precluded from litigating the issue before this court. *See* USCIT Rule 8(a) (requiring pleadings to make short and plain statement of claim).[11]

C. Home Market Warranty Expenses

    i. In-House Repair Costs

Samsung's warranty services in the home market consisted of in-house repairs and repairs by outside service centers. Samsung argues

---

[10] In its review of the second final administrative results, the court rejected ITA's rationale for classifying the SYPM rebates as indirect selling expenses based on timing considerations. *Independent Radionic Workers,* Slip Op. 94–144, at 18–20. Thus, no purpose would be served in directing ITA to adhere to its practice in the first and second reviews. As the issue was adjudicated in *Independent Radionic Workers,* the court declines to allow ITA to search for the third reason to reject the adjustment in these particular proceedings.

[11] Samsung also failed to exhaust its administrative remedies on this point. See discussion in *Independent Radionic Workers,* Slip-Op. 94–144, at 23–26.

before this court that ITA erred in treating the fixed components of in-house repair costs as indirect selling expenses. Samsung's questionnaire response mentions only that Samsung believes its variable warranty costs to be direct selling expenses. Def.'s Partial Opp'n to Def.-Ints.' Rule 56.2 Mot., Conf. App., Ex. 1, at 32. Its comments on the preliminary review results are confined to fees to outside service agents. *Id.* Ex. 4, at 6–7. Therefore, Commerce did not address this issue in the final results. *See* 53 Fed. Reg. at 24,977.

Samsung has failed to exhaust its administrative remedies, and no exceptions to the exhaustion requirement apply.[12] Because a remand would necessarily involve new factual analysis, the issue is not purely legal. *Budd Co. v. United States,* 15 CIT 446, 452 & n.2, 773 F. Supp. 1549, 1555 & n.2 (1991). Moreover, the application of the futility and intervening judicial decision exceptions in this situation would unduly prejudice the other parties to this action. *See Independent Radionic Workers,* Slip Op. 94–144, at 26–27 (in-house repair costs).

Samsung made the apparent tactical decision to object to ITA's treatment of variable expenses and fees to outside service agents without raising the issue of fixed expenses. Under these circumstances, waiver is not appropriate. *See Budd,* 15 CIT at 453, 773 F. Supp. at 1555–56 (finding that plaintiff's tactical decision not to raise issue before agency precluded it from raising issue before court). The court thus will not decide the merits of Samsung's claim regarding in-house repair costs.

### ii. Fees to Outside Service Agents

In the final determination, Commerce did not allow Samsung's fees to outside service agents as direct warranty expenses. 53 Fed. Reg. at 24,977. It explained,

> [i]n our deficiency letter to Samsung, we requested that they separately identify that portion of the agents' salaries devoted to repair work. However, Samsung did not comply with our request. It stated that Samsung [sic] only pays warranty fees from warranty services provided by those agents.

*Id.* Samsung contends that the answer it provided to ITA's request was a complete one—although some of its outside service agents were also distributors, the entire portion of the agents' salaries reported by Samsung was attributable to repair services. According to Samsung, there were no non-warranty expenses to identify separately.

In *Olympic Adhesives Inc. v. United States,* 899 F.2d 1565 (Fed. Cir. 1990), the Federal Circuit stated, "a 'No' answer is not a refusal to provide data. If there is no data, 'No' is a complete answer." *Id.* at 1573. Although *Olympic Adhesives* resolved a challenge to the application of best information available ("BIA"), *see* 19 U.S.C. § 1677e(b), (c) (1988), its logic is equally persuasive here.

---

[12] Three exceptions to the exhaustion requirement are: (1) the new issue is purely legal; (2) it would have been futile to have raised the argument at the agency level; (3) there has been an intervening judicial interpretation that would change the agency result. *Budd Co. v. United States,* 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991) (listing cases).

Commerce classified certain expenses as indirect because Samsung allegedly did not prove that they were warranty expenses entitled to direct treatment. If the entire reported value constituted warranty-related expenses, Samsung cannot be blamed for failure to segregate warranty and non-warranty expenses. Upon review of Samsung's arguments and the administrative record, Commerce has requested a remand to reconsider this issue. The court hereby grants Commerce's request.

VI. *Use of BIA to Determine Freight Allowance Discounts:*

Samsung granted freight allowance discounts to its ESP customers who purchased merchandise by the container load or who picked up orders exceeding a certain dollar amount from the subsidiary's warehouse. In response to ITA's request for information on non-quantity discounts, Samsung submitted an allocated per-unit discount amount.

ITA's final determination substituted BIA for Samsung's reported freight allowance expenses because Samsung failed to report them on a per-sale or per-customer basis. 53 Fed. Reg. at 24,985. The determination found no reasonable explanation for this failure, because Samsung's questionnaire response indicated that its U.S. subsidiary had sale-specific information. *Id.*

Samsung maintains that after it submitted the allocated amount, Commerce made no further requests for information. It stresses that the statute directs the use of BIA "whenever a party * * * refuses or is unable to produce *information requested."* 19 U.S.C. § 1677e(c) (emphasis added). The Federal Circuit's opinion in *Olympic Adhesives* provides that "the propriety of the ITA's invocation of the 'best information' rule depends on (1) whether [the party's] responses to information requests * * * were deficient * * *, and (2) whether the ITA gave [the party] warning and an opportunity to correct any such deficiencies." 899 F.2d at 1572–73.

ITA requests a remand to determine whether its use of BIA in this situation complied with *Olympic Adhesives.* Zenith and the Unions oppose a remand, citing *Koyo Seiko,* 16 CIT at 542–43, 796 F. Supp. at 1530, for the proposition that expenses must be reported on a product-specific basis to qualify as direct. The issue before the court, however, is not whether Samsung should have reported freight allowance discounts on a product-specific basis. The question is whether Samsung was ever given the opportunity to make such a submission. Therefore, this court grants the request of Commerce and Samsung for a remand to reconsider the use of BIA.

VII. *Adjustment for Free Parts and Merchandise:*

Samsung's supplemental questionnaire response indicates that Samsung adjusted the total value of direct purchase price transactions to reflect free spare parts and CTVs. Def.-Ints.' Conf. App. B, Tab 8, at 107 n.2. The response lists the raw value, while the computer tape uses the adjusted value. *Id.*

Zenith's comments on the preliminary results allege that Samsung's adjusted figures impermissibly increased the total value of direct purchase price transactions, potentially masking dumping margins. Joint Opp'n of Pl.-Ints. and Pl. to Def.-Ints.' Rule 56.2 Mot., Conf. R. App., Tab 5, at 19–20. Samsung replied that the same arguments had been rejected by Commerce in the previous administrative review. *Id.* Tab 7, at 9.

In the previous administrative review, Samsung submitted a computer tape that adjusted the reported quantities for certain sales to account for free parts and CTVs, effectively revising the gross unit price downward. *Color Televisions Receivers from Korea,* 51 Fed. Reg. at 41,368. ITA accepted this method. *Id.* In the final results at issue here, Commerce reached a different conclusion:

> in the final results of the previous review, we accepted Samsung's downward adjustment of gross unit price to account for the parts and televisions * * *. We have examined the computer tape data and have concluded that Samsung has upwardly adjusted its PP sales value and quantities. For the reasons stated in our previous review, we have stripped out the additional sales values and quantity sold, using Samsung's response as best information available.

53 Fed. Reg. at 24,978 (citation omitted).

On the day before the final results in this case were published in the Federal Register, Samsung wrote a letter to Commerce informing it that Samsung had made the same adjustment in the current review as in the previous review and declaring that Commerce had never asked for the particulars of the adjustment methodology. Joint Opp'n of Pl.-Ints. and Pl., Conf. R. App., Tab 9. Approximately two weeks later, Samsung sent a more detailed explanation to ITA with accompanying invoices and computer printouts. Def.-Ints.' Conf. App. B, Tab 5.[13]

Zenith and the Unions argue that Samsung, as the respondent, has the burden of making timely explanations to ensure that ITA understands and correctly uses the submitted data. *See Neuweg Fertigung GmbH v. United States,* 16 CIT 724, 728, 797 F. Supp. 1020, 1023–24 (1992). While this is true, it is also incumbent on Commerce to make determinations that are supported by substantial evidence on the record. 19 U.S.C. § 1516a(b)(2).

The only record evidence cited in support of Commerce's determination on this issue is five pages of computer data relating to Samsung's direct purchase price sales. Joint Opp'n of pl.-Ints. and Pl., Conf. R. App., Tab 6. According to Zenith and the Unions, these pages demonstrate an overstatement in sales. There are no cumulative totals and the data are in many instances completely illegible. After review of this record, ITA now requests a remand to consider whether Samsung's computer program properly adjusted for free televisions and parts.

---

[13] A comparison with the invoices shows that the computer printouts adjusted the quantity of CTVs sold by adding the number of free televisions, thereby decreasing the per-unit price, and sales price was decreased by the value of free parts.

Given the weak nature of the evidence in support of Commerce's determination on this point, the court agrees that a remand is necessary.[14]

### CONCLUSION

This case is hereby remanded to Commerce with instructions to (1) recalculate the VAT adjustment according to its new methodology (2) re-classify the SYPM credit rebates as direct selling expenses, (3) reconsider warranty-related fees to outside service agents as direct selling expenses, (4) reconsider the use of BIA to determine freight allowance discounts, and (5) reconsider the adjustment for free merchandise and parts. In all other respects, ITA's determination in the third administrative review of color televisions from Korea is sustained. Commerce is directed to submit its remand results within 90 days. Any comments thereon are due within twenty days thereafter. Commerce may respond in 12 days.

---

[14] Samsung has withdrawn its claim regarding the treatment of imputed interest expense.