**Slip Op. 01-104**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GREGORY W. CARMAN, CHIEF JUDGE**

| | |
|---|---|
| **VIRAJ GROUP, LTD.**<br><br>               **Plaintiff,**<br><br>    v.<br><br>**UNITED STATES OF AMERICA,**<br><br>               **Defendant,**<br><br>    **and**<br><br>**CARPENTER TECHNOLOGY, CORP.,**<br>**et al.,**<br><br>               **Defendant-**<br>               **Intervenors.** | **Court No. 00-06-00291** |

[In response to Plaintiff's Rule 56.2 motion for judgment on the agency record and Defendant's and Defendant-Intervenors' memoranda in opposition to Plaintiff's Rule 56.2 motion, the Department of Commerce's decision in *Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000) is sustained in part and remanded in part.]

*Ablondi, Foster, Sobin & Davidow* (*Peter Koenig*), Washington, D.C., for Plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *Lucius B. Lau*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Defendant.

*Collier Shannon Scott, PLLC* (*Robin H. Gilbert, Laurence J. Lasoff*), Washington, D.C., for Defendant-Intervenors.

Dated: August 15, 2001

**OPINION**

**CARMAN**, **Chief Judge:** This action challenges the United States Department of

Commerce's (Commerce) determination in *Stainless Steel Wire Rod from India; Final Results of*

*Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000) (*Final Results*).

Plaintiff has filed a motion for judgment on the agency record asserting that Commerce's

determination resulted in an inaccurate dumping margin.  The United States and Defendant-

Intervenors (collectively Defendants) oppose Plaintiff's motion.

**BACKGROUND**

On December 1, 1993, Commerce published antidumping duty orders on certain stainless

steel wire rod (SSWR) imported from India.  *See Antidumping Duty Order: Certain Stainless*

*Steel Wire Rod from India*, 58 Fed. Reg. 63,335 (December 1, 1993).  On December 8, 1998,  the

agency published a notice of opportunity to request an administrative review of this antidumping

duty order for subject merchandise imported between December 1, 1997 and November 30,

1998.  *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation;*

*Opportunity to Request Administrative Review*, 63 Fed. Reg. 67,646 (December 8, 1998).  In

response to this notice, Viraj Group[1] (Viraj or Plaintiff) and two other Indian manufacturers[2]

---

[1] The Viraj Group is comprised of three companies: Viraj Alloys Ltd. (VAL), Viraj
Impoexpo Ltd. (VIL), and Viraj Forgings Ltd. (VFL).

[2] These manufacturers ultimately withdrew their request for administrative reviews.  *See*
*Certain Stainless Steel Wire Rod From India; Preliminary Results and Partial Rescission of*
*Antidumping Duty Administrative Review*, 65 Fed. Reg. 1,597, 1,597 (January 11, 2000).

requested an administrative review. *See Certain Stainless Steel Wire Rod From India; Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review*, 65 Fed. Reg. 1,597, 1,597 (January 11, 2000) (*Preliminary Results*).

On February 22, 1999, Commerce initiated its review. During its investigation, Commerce determined that Plaintiff had no sales of subject merchandise in the home market within the period of review. Therefore Commerce was required to establish normal value through some other means. *See id.* at 1,599. After rejecting the use of Plaintiff's third-country sales for normal value because of a lack of contemporaneous sales of foreign like product in the comparison market, Commerce constructed a value in accordance with its statutory and regulatory guidelines. *See id.* Ultimately, Commerce published its *Final Results* on May 17, 2000, concluding that an antidumping duty rate of 11.88% should be applied to Plaintiff's imports of subject merchandise. *See Final Results*, 65 Fed. Reg. 31,302.

Plaintiff timely filed suit with the Court challenging three aspects of Commerce's *Final Results*. Specifically, Plaintiff asserts: (1) the exchange rate used by Commerce to convert Indian rupees into United States dollars created an inaccurate dumping margin; (2) to account for import duties paid on raw materials, Plaintiff was entitled to an adjustment of either (i) its export price, or (ii) its cost of production or constructed value; and (3) Commerce should have used Plaintiff's actual production cost of steel billets rather than its inter-company transfer price to calculate constructed value.

For the reasons stated below, the Court remands the first issue to Commerce for further explanation as to whether Commerce's currency conversion methodology resulted in an accurate

dumping margin. The Court sustains Commerce's determination with respect to the second and third issues.

**JURISDICTION AND STANDARD OF REVIEW**

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994) and will sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B) (1994).  Commerce's determinations are to be afforded considerable deference.  *See, e.g., Zenith Elecs. Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996); *Daewoo Elec. Co., Ltd. v. International Union*, 6 F.3d 1511, 1516 (Fed. Cir. 1993).  Commerce may not, however, act arbitrarily, violate the antidumping laws, or apply the law in a manner contrary to congressional intent.  *See* Allied *Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000), *citing, Smith Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983); *Hussey Copper Ltd. v. United States*, 895 F. Supp. 311, 314 (Ct. Int'l Trade 1995).

Commerce's factual determinations must be supported by substantial evidence on the record.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Under this standard, the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusion. *See Heavafil Sdn. Bhd. & Filati Lastex Sdn. Bhd. V. United States*, 2001 WL 194986, *2 (Ct. Int'l Trade), *citing, Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,

1563 (Fed. Cir. 1984).

In determining whether Commerce's interpretation of the antidumping statute is "in accordance with law," this Court must consider whether the statute unambiguously addresses the question at issue and, if not, whether the agency's interpretation of the statute is reasonable in light of the overall statutory scheme. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). This Court accords considerable weight to Commerce's construction of the antidumping laws, *see E.I. Du Pont De Nemours & Co. v. United States*, 8 F. Supp. 2d 854, 857 (Ct. Int'l Trade 1998), but does not fulfill its duty to say what the law is by perfunctorily agreeing with Commerce's interpretation of the relevant statutory provision. *See Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). Rather, through the application of traditional tools of statutory construction, this Court must examine whether Congress expressed its intent on the matter at issue. Only if Congress was silent or ambiguous with respect to the question at issue can the Court assess whether Commerce's construction thereof is reasonable or merely a *post hoc* rationalization. *See id.* at 882. To survive judicial scrutiny, however, "an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation . . . . [A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *U.S. Steel Group v. United States*, 225 F.3d 1284, 1287 (Fed. Cir. 2000); *NSK Ltd. v. United States*, 115 F.3d 965, 973 (Fed. Cir. 1997); *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (internal citation omitted) (emphasis in original).

**I.      Commerce's currency conversion methodology appears to disregard a devaluation in the Indian rupee, resulting in a dumping margin that is unsupported by substantial evidence and contrary to law.**

To determine whether a company is selling goods in the United States at less than fair value, Commerce compares the normal value of the subject merchandise to the price at which that merchandise is being sold in the United States. *See* 19 U.S.C. § 1677b(a) (1994). Such comparison, however, frequently requires that Commerce calculate values denominated in different currencies. To correct for the differences in value associated with different currencies, the antidumping law requires that "the administering authority [] convert foreign currencies into United States dollars using the exchange rate in effect on the date of sale of the subject merchandise." 19 U.S.C. § 1677b-1(a) (1994). The only statutory exception to this requirement is when a "currency transaction on [the] forward markets is directly linked to an export sale under consideration." *Id*. Under these circumstances, "the exchange rate specified with respect to such currency in the forward sale agreement shall be used to convert the foreign currency." *Id*. The statutory exception is not applicable in this case.

Commerce selected the November 3, 1997 purchase order date as the date of sale. The agency acknowledged that "[w]hile the Department normally will use the date of invoice as the date of sale, we have determined in this case that the purchase order date better reflects the date on which Viraj established the material terms of sale. In this case, Viraj stated in its April 19, 1999 questionnaire response that the material terms of sale are set at order date. *Preliminary Results*, 65 Fed. Reg. at 1,598. Commerce further acknowledged that its chosen date of sale fell outside the period of review. It justified its selection on the grounds that it possesses discretion

to consider sales which fall outside the period of review and that, according to its practice, it had reviewed sales of merchandise shipped to the U.S. during the period of review. *See id.*

Based on its date of sale determination and pursuant to the requirements of 19 U.S.C. § 1677b-1(a) and 19 C.F.R. § 351.415,[3] Commerce used the November 3, 1997 exchange rate to convert Indian rupees into United States dollars. The exchange rate on this date was 36.40 rupees per dollar. Between the date of sale and November 30, 1998 (the end of the period of review), the rupee devalued over 10 percent to a rate of 42.65 rupees per dollar.[4]

## A. *Parties' Contentions*

Plaintiff contends that use of the November 3, 1997 exchange rate distorted the dumping margin calculations in the following manner. First, the post-November 3, 1997 rupee devaluation increased Viraj's cost of production, in part by requiring Viraj to pay more rupees for its imported raw materials. Second, because of the devaluation, Viraj ultimately received more rupees for the U.S. dollar price of the subject merchandise, thereby offsetting the increase in cost of production. Third, the dumping margin failed to reflect this offset because Commerce's use of

---

[3]19 C.F.R. § 351.415 provides:

(a) In general. In an antidumping proceeding, the Secretary will convert foreign currencies into United States dollars using the rate of exchange on the date of sale of the subject merchandise.

(c) Exchange rate fluctuations. The Secretary will ignore fluctuations in exchange rates.

[4]The source for this information is the Department of Commerce's Exchange Rates for Administrative reviews at <www.ita.doc.gov/import_admin/records/exchange/india.txt>.

the November 3, 1997 exchange rate caused the rupees actually received by Viraj to be understated by about 16 percent. Plaintiff claims the 11.88 percent dumping margin found in the *Final Results* is entirely due to this failure to account for devaluation.

In support of its contention, Plaintiff argues Commerce must determine dumping margins as accurately as possible, and Court precedent does not permit Commerce to mechanically apply its exchange rate methodology or to create an artificial dumping margin. Plaintiff criticizes Commerce for including no claim of accuracy in its *Decision Memorandum*.[5]

Plaintiff further argues Commerce could have used a different exchange rate because it has discretion to determine the date of sale. The statute and regulations state the exchange rate at the date of sale must be used but do not determine the precise date of sale. Plaintiff specifically argues the invoice date should be the date of sale because delivery and payment dates changed between the purchase order date and invoice date.

Plaintiff also argues that the currency conversion statute and regulation are structured in such a way as to, in certain circumstances, require the use of an exchange rate date other than the date of sale. Citing to the fact that the currency conversion rules are captioned under the heading "In General," Plaintiff argues that exceptional circumstances may exist that would require Commerce to deviate from the general rule. Plaintiff argues this case presents such exceptional circumstances.

Finally, Plaintiff argues Commerce's failure to use the rupee value actually received and

---

[5]All issues raised by the parties to the administrative review were addressed in the "Issues and Decision Memorandum" (*Decision Memorandum*), which was adopted by *Stainless Steel Wire Rod from India; Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 31,302 (May 17, 2000).

recorded in Viraj's books is inconsistent with past agency practices.

Defendants counter that 19 U.S.C. §1677b-1 and 19 C.F.R. § 351.415 require Commerce to use the exchange rate in effect upon the date of sale, not the date payment is received. In addition, Defendants state 19 C.F.R. §351.401(i) limits Commerce's date of sale choices to the invoice date or a date better reflecting the establishment of material terms of sale, and although the invoice date is the presumptive date of sale, 19 C.F.R. §351.401(i) does not foreclose Commerce from choosing another date. Here, Defendants claim Commerce properly selected the order confirmation date as the date of sale because there were no changes to the material terms of sale between the issuance of the order confirmation sheet and the invoice. Furthermore, Defendants assert none of Viraj's transactions are forward market transactions that would trigger the exception from the general rule requiring use of the date of sale for currency conversions. Finally, Defendants argue the precedent cited by Plaintiff is factually and legally distinguishable from the case at hand.

**B.** *Exchange Rate Analysis*

This Court does not dispute that Commerce adhered to its regulatory and statutory obligations to utilize the exchange rate in effect on the date of sale. Commerce also adhered to 19 C.F.R. §351.401(i) in its selection of the date of sale. Under that regulation, Commerce presumptively establishes the date of sale as the invoice date unless a different date better reflects the date on which the material terms of sale were established. Substantial evidence supports Commerce's determination that the material terms of sale were established on the purchase order

date. Viraj's March 24, 1999 questionnaire response stated that "[o]nce the order is confirmed there are no changes in terms of the sale." *See Questionnaire Response* (March 24, 1999), at 6, Prop. Doc. 1, Def.'s Prop. App. 1 at 6. At verification, Commerce's review of the invoices of all pre-selected and surprise sales revealed no changes to the terms of sale between issuance of the order confirmation sheet and the invoice. *See Sales Verification Memorandum* (January 3, 2000), at 4, Prop. Doc. 19, Def. Prop. App. 7 at 4.

Plaintiff now argues the material terms of sale were not established on the purchase order date because delivery and payment terms changed prior to the invoice date. This Court, however, will not consider Plaintiff's potentially valid argument because Plaintiff did not raise it in the administrative proceeding. Under the exhaustion doctrine, a party must present a claim for the relevant administrative agency's consideration prior to raising it before the Court. *See Fabrique de Fer de Charleroi S.A. v. United States*, 2001 WL 753810 at *2 (Ct. Int'l Trade 2001). *See also* 28 U.S.C. § 2637(d) (stating that the Court of International Trade "shall, where appropriate, require the exhaustion of administrative remedies"). Plaintiff presents no compelling justification for the Court to forego this requirement. Therefore, based on the record before it, this Court finds Commerce selected an appropriate date of sale.

Once the proper date of sale is chosen, Commerce is legally obligated to use the currency exchange rate from that date. The record indicates the sales at issue were not tied to currency exchange transactions on the forward market, thereby negating the applicability of the exception found in 19 U.S.C. § 1677b-1(a) and 19 C.F.R. § 351.415(b). Commerce therefore followed the mandate set forth by law and used the exchange rate from the date of sale. The Court cannot find

Commerce's use of this date unreasonable in light of the clear language of 19 U.S.C. § 1677b-1 and 19 C.F.R. § 351.415.

The fact that Commerce's actions were reasonable in light of their statutory and regulatory mandates is not dispositive, however, of whether the 11.88 percent dumping margin assessed against Plaintiff was in accordance with law. Mere compliance with regulations cannot trump what appears to be an absurd result. Both this Court and the United States Court of Appeals for the Federal Circuit have consistently held that Commerce is under a duty to determine dumping margins as accurately as possible. *See, e.g., NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *Allied Tube & Conduit Corp.*, 127 F. Supp. 2d 207, 218 (Ct. Int'l Trade 2000). Congress acknowledged the need for accuracy when it stated, "To a large extent, the [Uruguay Round] Agreement tracks existing practice, the goal of which is to ensure that the process of currency conversion *does not distort dumping margins*." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 841 (1994) (emphasis added). Accordingly, this Court must not only assess the reasonableness of Commerce's actions in light of its statutory requirements but also whether the agency's actions further the antidumping statute's underlying goal of accuracy. In light of the apparent devaluation of the rupee against the dollar, it is not clear whether Commerce's use of the November 3, 1997 exchange rate results in the most accurate dumping margin possible.

As noted, Plaintiff argues that the rupee devaluation resulted in a substantial understatement of the amount of rupees actually received in payment for exported subject merchandise. The record does not provide evidence that Commerce properly considered this

argument. Rather, Commerce simply stated that Viraj had provided no record evidence of a misapplication of the exchange rates and that Commerce had complied with the statute and its regulation. *See Decision Memorandum*, at 10. The only statement that could be construed as analysis of this issue is Commerce's statement that it had ignored fluctuations in the exchange rate. This statement, however, is insufficient to address the concerns raised by Plaintiff. Plaintiff submitted evidence on the record of the rupee's devaluation and the impact of this devaluation on both its costs and accounts receivable. Moreover, the extent (over ten percent) and the duration (over twelve months) of the devaluation seem to belie the notion that it was a mere fluctuation. Commerce has, in the past, recognized that sustained currency movements of greater than five percent are not fluctuations that can be ignored. *See Stainless Steel Sheet and Strip in Coils From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 64 Fed. Reg. 30,664 (June 8, 1999); *and Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 64 Fed. Reg. 56,759 (Oct. 21, 1999). In light of such past decisions, this Court seeks further explanation as to why Commerce disregarded the rupee's devaluation in the present case.

If Commerce has legitimate reasons for considering the rupee's devaluation to be simply a fluctuation, then Commerce arguably was within its rights to have ignored it. However, if ignoring this devaluation results in a distorted or inaccurate dumping margin, Commerce should consider alternative means to comply with the antidumping law's underlying goals. In *Budd Co., Wheel & Brake Div. v. United States*, 746 F. Supp. 1093 (Ct. Int'l Trade 1990), this Court affirmed Commerce's use of a circumstance of sale adjustment to offset the effects of

hyperinflation in Brazil between the date of sale and date of shipment.  Although the Court did

not require the use of a circumstance of sale adjustment to account for all changes in exchange

rates, it viewed favorably Commerce's efforts to fulfill its "overriding duty to make fair

comparisons between foreign market value and United States price . . . ."  746 F.Supp. at 1100.

This Court queries whether alternative means to comply with the underlying goal of the

antidumping law should be considered.

A mere mechanical application of Commerce's exchange rate methodology would be

contrary to the underlying goal of the antidumping laws.[6]  Thus, this Court finds the agency's

failure to explain its reasons for ignoring the devaluation and to explore methods for calculating

the most accurate dumping margin possible is contrary to law.  Accordingly, the Court remands

this issue to Commerce for further explanation and/or recalculation as may be required.


**II.     Commerce's decision not to adjust Viraj's export price or cost of production based on Viraj's receipt of benefits under India's Duty Entitlement Passbook (DEPB) program is supported by substantial evidence and otherwise in accordance with law.**

Under the Duty Entitlement Passbook (DEPB) program, the Indian government rebates

duties paid on raw materials imported for use in the manufacture of exported goods.  Rather than

rebate the actual amount of duties paid, however, the Indian government rebates a percentage of

---

[6] This Court is sympathetic to the potential catch-22 within which Congress has placed Commerce regarding currency conversion.  The statute clearly seems to establish only one exception to its general rule.  As the present case indicates, however, factual scenarios may occur that do not fit within the parameters of the seeming exception but may nevertheless result in an inaccurate dumping margin.  The Court invites Congress to consider whether legislation is needed to address this anomaly.

the value of the exported product containing the imported materials. This percentage is applied equally to all exported products containing a specific imported input. *See Supplemental Questionnaire Response* (June 25, 1999), at 5, Prop. Doc. 8, Def. Prop. App. 3 at 5. Thus, the rebate is based upon the "deemed" import duties paid on imports used to manufacture the exported product. *See id.*, at 14, Prop. Doc. 8, Fiche 17, Frame 14. Viraj receives benefits under this program. *Decision Memorandum* at 3.

Commerce's sales verification report for Viraj Impoexpo Ltd. (VIL) discussed the following steps in the DEPB Passbook credit process: first, Viraj sends a bill of entry of raw material to the Indian Customs Office, listing quantity and value of the imported raw materials; second, after production and shipment of the finished product, VIL gives a form with the details of quantity and value to the Director General of Foreign Trade; third, the Director General of Foreign Trade subtracts freight and insurance costs from the value to reach an FOB[7] value of the export; fourth, this information is given to Viraj to verify the accuracy of the calculations; fifth, Viraj gives the information to Customs for payment. *Sales Verification Memorandum* (January 3, 2000), at 11, Prop. Doc. 19, Def. Prop. App. 7 at 11.

The Indian government publishes a notice of the credit an exporting company may claim under the DEPB program. *See Supplemental Questionnaire Response* (June 25, 1999), at 15, Prop. Doc. 8, Fiche 17, Frame 15. Commerce examined the Indian government's public notice, which reported a 15 percent duty drawback rate on the FOB value of stainless steel wire rod.

---

[7]*Black's Law Dictionary* defines FOB as "Free on board some location (for example, FOB shipping point; FOB destination). A delivery term which requires a seller to ship goods and bear the expense and risk of loss to the [FOB] point designated. The invoice price includes delivery at seller's expense to that location." *Black's Law Dictionary* 642 (6th ed. 1990).

*Sales Verification Memorandum* (January 3, 2000), at 11, Prop. Doc. 19, Def. Prop. App. 7 at 11.

In addition, at verification Commerce collected a table from a generally available publication[8]

which listed the rate for wire rods and billets as 15 percent of FOB value.  Commerce included

this table in Sales Verification Exhibit 15, to which it referred in the *Decision Memorandum*.

Def. Prop. App. 8 at 4.

Commerce preliminarily adjusted Viraj's export price, adding an amount for duty

drawback based on benefits received through the DEPB program because 19 U.S.C.

§1677a(c)(1)(B) provides that export price (or constructed export price) shall be increased by

"the amount of any import duties imposed by the country of exportation which have been

rebated, or which have not been collected, by reason of the exportation of the subject

merchandise to the United States." *See Preliminary Results*, 65 Fed. Reg. at 1,598-99, citing

section 772(c)(1)(B) of the Tariff Act of 1930.  Petitioners challenged this adjustment, claiming

the DEPB benefits did not qualify as a duty drawback adjustment under Commerce's two-

pronged test that requires:  (1) a sufficient link between the import duty and the rebate; and (2) a

sufficient amount of raw materials imported and used in the production of the final exported

product. *Decision Memorandum* at 3-4.  Viraj responded that Commerce had appropriately

adjusted the export price but that if the duty drawback adjustment were denied, Commerce

should reduce the cost of raw materials used in the constructed value calculation.  *Id*. at 5-6.

Commerce agreed with petitioners and decided not to adjust the export price for DEPB

benefits received by Viraj.  Commerce found a connection between the rebate and FOB price of

---

[8]Kumar & Garg, *Duty Entitlement Passbook Scheme*, (April 1998).

the exported merchandise rather than a connection to the import duty paid, and that the Indian government arrived at the amount of drawback credit by using a pre-established determination of import content that failed to link the rebate to the import duties actually paid. *Id*. at 7. Commerce therefore concluded that Viraj had not established a link between the duties paid and rebate received. Because Viraj failed the first prong of the test, Commerce stated it was unnecessary to consider the second prong. *Id*. at 8.

Commerce also rejected Viraj's alternative claim that the cost of raw materials used in the calculation of constructed value should be reduced. Commerce did not reduce material costs because Viraj did not establish that the duties offset by the DEPB benefits had ever been entered as a cost of materials in its books and records. Additionally, Viraj recorded the DEPB benefits in its financial statements as revenue rather than as an offset to an expense. Thus, Commerce found no connection between the revenue Viraj received and its raw material costs. *Id*. at 8.

## A. *Parties' Contentions*

Plaintiff contends Commerce should increase the export price by the rebate amount of the DEPB credit because it has satisfied the conditions set forth in the relevant statute, 19 U.S.C. §1677a(c)(1)(B). Citing *Certain Welded Carbon Standard Steel Pipes and Tubes from India; Final Results of New Shippers Antidumping Duty Administrative Review*, 62 Fed. Reg. 47,632, 47,635 (Sept. 10, 1997) (*Pipes and Tubes from India*), Plaintiff also contends that when benefits from an intended duty drawback program are actually used to pay import duties on raw material used for exports, the duty drawback must be recognized in the dumping margin calculation.

Alternatively, Plaintiff contends Commerce should reduce Plaintiff's raw material costs based on its receipt of DEPB benefits. Plaintiff states it recorded the credit as revenue to offset the import duty expense that it claims to have included in the raw material cost in its books.

Finally, Plaintiff argues that during the review Commerce never raised concerns about Viraj's practice of recording the DEPB benefits as revenue. The lack of notice and opportunity to comment on this issue, Plaintiff contends, constitutes a due process violation.

Defendants counter that Commerce properly decided not to adjust the export price for DEPB benefits received because record evidence fully supports Commerce's finding that no link exists between the import duty and rebate. Defendants argue the Indian government's use of an assumed import content and a fixed percentage of the FOB value of exports does not link the rebate received to import duties actually paid. For support, Defendants claim Viraj submitted information to the Indian government regarding the quantity and value of the imported materials rather than the value of import duties paid. Moreover, Defendants state Viraj, as the interested party, had the burden to prove the amount and nature of the adjustment sought. *See* 19 C.F.R. § 351.401(b)(1) (2000).

Defendants distinguish *Pipes and Tubes from India* from the present case, as *Pipes and Tubes from India* involved an earlier drawback program. In addition, Defendants claim it could not apply because Viraj, by failing to meet Commerce's two-pronged test, did not use the DEPB system as a proper duty drawback program. Defendants state that *Stainless Steel Round Wire from India; Final Determination of Sales at Less Than Fair Value*, 64 Fed. Reg. 17,319 (April 9, 1999) (*Round Wire from India)* was more instructive for Commerce because in that case

Commerce denied a duty drawback adjustment where the incentive credits were not based upon the amount of actual import duties paid.

Defendants next refute Viraj's alternative contention, claiming Commerce properly determined the DEPB benefits warranted no adjustment to cost of production or constructed value. Defendants state that cost of production and constructed value include "the cost of materials and [of] fabrication or other processing of any kind . . . ." 19 U.S.C. § 1677b(b)(3)(A) and 19 U.S.C. § 1677b(e)(1). Defendants also state that "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Defendants state Commerce did not find any import duties offset by DEPB benefits included in Viraj's books and records as a cost of materials. Instead, it found the DEPB benefits recorded as revenue rather than an offset to an expense, leading the agency to find no link between revenue received and the cost of purchasing raw materials. Defendant asserts that accepting Viraj's financial records, kept according to generally accepted accounting principles of the country of exportation, did not distort the company's true costs.

Finally, Defendants argue Viraj could have addressed this issue during the review because *Round Wire from India* was made a public record before the conclusion of this administrative review.

**B.  *DEPB Passbook Analysis***

>    i)      Commerce's decision not to increase Viraj's export price based on its receipt of benefits under the DEPB program is supported by substantial evidence and otherwise in accordance with law.

The applicable statute, 19 U.S.C. § 1677a(c)(1)(B), provides that export price and constructed export price shall be increased by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States . . . ."  Commerce uses a two-prong test for determining whether the export price must be increased:  (1) the import duty and rebate must be directly linked to, and dependent upon, one another; and (2) there must be sufficient imports of the imported raw materials to account for the drawback received on the exported product.  This Court has upheld Commerce's test.  *See Rajinder Pipes Ltd., v. United States*, 70 F. Supp. 2d 1350, 1358 (Ct. Int'l Trade 1999) (quoting *E.I. DuPont de Nemours & Co., Inc. v. United States*, 841 F. Supp. 1237, 1242 (Ct. Int'l Trade 1993)).

Substantial evidence supports Commerce's conclusion that Viraj failed to satisfy the first prong of the two-part test.  As Viraj stated in its June 25, 1999 questionnaire response: "The amount of duty drawback we receive is [a] fixed percentage calculated by [the Indian] government to cover the cost of import duty on raw material. [F]or wire rod export we get 15% [of] the [FOB] value of export." *Supplemental Questionnaire Response* (June 25, 1999), at 5, Prop. Doc. 8, Def. Prop. App. 3 at 5.  Sales Verification Exhibit 15 confirmed the drawback rate to be 15 percent of the FOB for wire rods and billets.  Def. Prop. App. 8 at 4.  In addition, an August 8, 1998 bill of entry for raw materials showed the DEPB amount being debited from the

customs duty to be 15 percent of the FOB value of the goods. *See Sales Verification Memorandum* (January 3, 2000), at 11, Prop. Doc. 19, Def. Prop. App. 7 at 11. Commerce correctly stated the record demonstrates only a link between the rebate and the FOB price of the exported merchandise, not between the duty paid and the duty drawback rebate as required. *Decision Memorandum* at 7. Reliance upon the Indian government's pre-determined import content for exported merchandise fails to link the rebate to duties actually paid on raw materials imported. *Id.*

Plaintiff misplaces its reliance upon *Pipes and Tubes from India*. In the program at issue in that review, the government of India reduced the amount of duties owed on future imports contingent upon the final exported merchandise incorporating "an amount of the input product *equivalent* to that which was previously imported" and an equivalent amount of duties being previously suspended. *Pipes and Tubes from India*, 62 Fed. Reg. at 47,635 (emphasis added). The program at issue here involves a "deemed" import duty that was not involved in *Pipes and Tubes from India*.

ii) Commerce's decision to deny an adjustment to cost of production or constructed value is supported by substantial evidence and otherwise in accordance with law.

Substantial evidence supports Commerce's denial of an adjustment to Plaintiff's cost of production or constructed value. Viraj did not establish that any import duties offset by the DEPB benefits were ever included in the company's books and records as a cost of materials. *Decision Memorandum* at 8. In addition, the DEPB benefits were recorded on Viraj's financial

statements as revenue, not as an offset to an expense. *Id.* Nothing in the record supports Plaintiff's assertion that "[a]s the *Decision* [*Memorandum*] acknowledges, Viraj used the DEPB/Passbook benefits to pay import duties, such that no import duties are really paid on raw material imports." (Mem. in Supp. of Pl.'s Mot. for J. on the Agency R. at 10.) Neither is there support for Plaintiff's claim that "[t]he only reason DEPB/Passbook benefits could have been included as revenue in Viraj's books . . . was that the DEPB/Passbook benefits offset import duty expense included in the raw material cost in Viraj's books." *Id.*

To arrive at cost of production and constructed value, Commerce includes in its calculations "the cost of materials and [of] fabrication or other processing of any kind . . . ." *See* 19 U.S.C. § 1677b(b)(3)(A) and 19 U.S.C. § 1677b(e)(1). In doing so, Commerce follows 19 U.S.C. §1677b(f)(1)(A), which states that "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." Viraj's financial records are kept in accordance with the generally accepted accounting principles of India (*See Questionnaire Response* (August 30, 1999), at D-5, Def. Prop. App. 4 at D-5), and Viraj has raised no evidence that its books do not reasonably reflect the costs associated with the production and sale of the merchandise. By calculating costs based on Viraj's records, Commerce's decision not to reduce the raw material cost is in accordance with the statutory requirements above. No record evidence indicates any import duties offset by the DEPB benefits were ever included in the company's books and records as a

cost of materials

Finally, Plaintiff has not persuaded this Court that it has been denied notice and opportunity to comment with respect to its practice of recording the DEPB benefits as revenue. Initially, Plaintiff did not provide sufficient evidence to Commerce of entitlement to a duty drawback adjustment to its export price. Although Commerce allowed for a duty drawback adjustment in the *Preliminary Results*, after considering petitioner's objections, it found Viraj did not qualify. Viraj had opportunity to rebut petitioner's objections. Because Commerce originally granted the export price adjustment, it was not until after the *Preliminary Results* that raw material price adjustment became an issue. Commerce had no reason to raise concerns earlier. Although the *Decision Memorandum*, as adopted by the *Final Results*, appears to rely upon *Round Wire from India*, it was not necessary for Viraj to have notice of Commerce's decision in *Round Wire from India* in order for its books to demonstrate the relationship between the benefit received and the cost of purchasing raw materials.

**III. Commerce's decision to use Viraj's inter-company transfer price to value steel billets for purposes of calculating constructed value is supported by substantial evidence and otherwise in accordance with law.**

As stated previously, because Viraj did not have any contemporaneous domestic or third-party sales during the period of review, Commerce was required to construct a normal value for subject merchandise. The antidumping laws provide that, with certain exceptions, constructed value shall include the cost of materials, fabrication or other processing, as well as an amount for selling, general and administrative expenses, and profit incurred in connection with the

production and sale of a foreign like product or merchandise in the same general category of products as the subject merchandise for consumption in the foreign country. *See* 19 U.S.C. § 1677b(e)(1) and (2)(A) & (B) (1994). Commerce's regulations reflect the requirements of 19 U.S.C. § 1677b(e) and permit the agency to construct normal value "based on the cost of manufacture, selling general and administrative expenses, and profit." 19 C.F.R. § 351.405(a) (2000).

In the present case, Commerce calculated Plaintiff's cost of production based on its cost of materials and fabrication for the foreign like product, including the cost of the tolling operation performed by a third party. *See Preliminary Results,* 65 Fed. Reg. at 1,599. Additionally, where necessary Commerce added an amount for third country selling, general and administrative expenses, and packing costs. *See id.* Commerce noted, however, that VIL, one of the three companies comprising the Viraj Group, had purchased the billets used in production of the subject merchandise from its affiliated company, VAL. *See id.* (citing Plaintiff's *Section D Questionnaire Response*, (August 30, 1999), at D4-D5, Prop. Doc. 13, Def. Prop. App. 4 at 5-6). Commerce further noted that because steel billets are a major input in the production of Plaintiff's subject merchandise, the major input rule should be applied to value the billets that VIL obtained from VAL. *See id.*

The major input rule provides that Commerce may value inputs obtained from affiliated parties at the highest of the transfer price, market price, or the cost of production. *See* 19 C.F.R. § 351.407(b). Accordingly, Commerce compared VAL's cost of production to the transfer price charged by VAL for the steel billets and determined that the transfer price exceeded the cost of

production. Commerce also verified that the transfer price was identical to the market price. *See*
*Preliminary Results*, 65 Fed. Reg. at 1,599 (citing *Memorandum to the File: Certain Stainless*
*Steel Wire Rod from India-Antidumping Administrative Review 12/01/97 through*
*11/30/98--Verification of Viraj Impoexpo's ("VIL") and Viraj Alloys ("VAL") Cost of*
*Production ("Cost Verification Report")*, at 8 (January 3, 2000)). Accordingly, Commerce
valued steel billets at the transfer price for purposes of calculating constructed value.

### A.      *Parties' Contentions*

Plaintiff contends Commerce should have used the actual cost of production for billets as
opposed to the transfer price between VIL and VAL. In support of its contention, Plaintiff argues
that Commerce should have collapsed VIL and VAL for purposes of its investigation and,
therefore, considered them to be one entity. Once VIL and VAL were properly established as a
single entity, Plaintiff argues that the inter-company transfer price should be eliminated, thereby
leaving only the cost of production as a viable value. Additionally, Plaintiff argues that the use
of transfer price results in an impermissible double-counting of profit in the dumping margin
calculation because in addition to the normal amount allowed for profit, the transfer price also
contains a profit margin.

Defendants counter that Commerce's use of the transfer price for steel billet was
supported by substantial evidence and otherwise in accordance with law. Citing 19 C.F.R. §
351.407(b), Defendants argue the major input rule permits Commerce to value inputs at the
highest of the cost of production, market price or transfer price. Because VAL's transfer price

exceeded VIL's cost of production and equaled the market price, Defendants argue Commerce's selection was reasonable. Additionally, Defendants argue that VAL and VIL were properly treated as separate entities for purposes of valuing steel billets. Defendants note that Commerce may collapse companies only when specific regulatory requirements are satisfied and that, in the present case, such requirements were not met.

**B.** *Transfer Price Analysis*

Commerce properly valued steel billet at the inter-company transfer price as opposed to VAL's costs of production. Commerce's regulations do not constrain the agency's discretion in valuing the major inputs of subject merchandise. To the contrary, as this Court has consistently held, 19 C.F.R. § 351.407(b) provides Commerce may value such inputs at the highest of transfer price, market price or cost of production. *See SKF USA, Inc. v. United States*, 116 F. Supp. 2d 1257, 1267 (Ct. Int'l Trade 2000), *Mannesmannrohren-Werke AG v. United States*, 77 F. Supp. 2d 1302, 1310-12 (Ct. Int'l Trade 1999). Thus, although it is not required that Commerce select the highest of these three values, the decision to do so is left to the agency's discretion. *See SKF USA, Inc.*, 116 F. Supp. 2d at 1267.

In the present case, Plaintiff presents no evidence that would indicate Commerce abused its discretion in selecting the inter-company transfer price to value steel billet. Plaintiff does not challenge Commerce's finding that steel billet is a major input, nor does it assert that Commerce miscalculated the inter-company transfer price. Rather, Plaintiff asserts that the inter-company transfer price was inappropriate because VIL and VAL should have been collapsed and,

therefore, treated as a single entity.  Plaintiff fails, however, to demonstrate how VAL and VIL satisfy the collapsing requirements set forth in 19 C.F.R. § 351.401(f).  Commerce may only "treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" and the agency "concludes that there is a significant potential for the manipulation of price or production."  19 C.F.R. § 351.401(f)(1).  Commerce determined that VAL produces steel billets and that VIL manufactures both stainless steel bright bar and stainless steel wire rod.  *See Decision Memorandum* at 13.  Commerce concluded that the production facilities necessary to manufacture these diverse products were sufficiently different as to require substantial retooling of either facility in order to restructure manufacturing priorities.  *See id.*  Because Viraj failed to meet the first collapsing requirement of 19 C.F.R. § 351.401(f)(1), Commerce stated the issue of price manipulation was moot.  *See id.* at 13-14.  As Plaintiff was unable to comply with the requirements for collapsing set forth in 19 C.F.R. § 351.401(f), this Court will not disturb the conclusions of Commerce.  Accordingly, this Court finds that Commerce properly chose not to collapse VAL and VIL for purposes of calculating the value of steel billet.

Plaintiff additionally argues that, by using the inter-company transfer price, Commerce impermissibly included the profit built into that price in its constructed value calculation. Plaintiff supports its argument by citing to *Notice of Final Determination of Sales at Less than Fair Value:  Live Cattle From Canada*, 64 Fed. Reg. 56,739, 56,748 (October 21, 1999) (*Live Cattle*), which stated:

> [I]t is proper, when reporting sales and cost data, to eliminate inter-company transactions between companies that the Department is treating as a single entity... [I]t would be illogical to include inter-company profits in the actual cost of production of the group.

*See also Notice of Final Determination of Sales at Less than Fair Value:  Stainless Steel Wire Rod from Korea*, 63 Fed. Reg. 40,404, 40,421 (July 29, 1998) (*Wire Rod*).  Plaintiff's argument and its reliance upon its cited precedent are misplaced.  In both *Live Cattle* and *Wire Rod,* Commerce concluded that the requirements of 19 C.F.R. § 351.401(f) were satisfied, thereby permitting the agency to treat the several companies as a single entity.  The validity of Plaintiff's argument, therefore, depends upon the collapsing of VAL and VIL, and the Court has already found that Commerce properly chose not to treat the two companies as a single entity.  Unlike the relationships in *Live Cattle* and *Wire Rod*, the business relationship between VAL and VIL appears to be limited to that of manufacturer and supplier despite their affiliated status.  As Commerce noted in *Live Cattle,* 64 Fed. Reg. at 56,748, the "major input rule[] appl[ies] to transactions between the respondent [manufacturer] and an affiliated raw material supplier or service provider."  Thus, because the transaction between VAL and VIL is analogous to a sale between manufacturer and supplier, Commerce properly incorporated any profit margin built into VAL's transfer price into Viraj's cost of production.  This Court is therefore persuaded that Commerce properly valued steel billet and did not double count profit in violation of the antidumping laws.  Accordingly, Commerce's use of the inter-company transfer price is sustained.

## CONCLUSION

Upon Plaintiff's challenge to Commerce's currency conversion methodology in the *Final Results*, the Court remands this case to Commerce to explain why it did not take into account the devaluation of the rupee against the dollar to obtain the most accurate dumping margin possible and, should it be necessary, to recalculate such margin as may be required. In all other respects the determination of Commerce is sustained.

_____

 Gregory W. Carman
Chief Judge

Dated: August 15, 2001
     New York, New York